DEXTER A. KNOWLTON, Respondent, *v.* THE CONGRESS AND EMPIRE SPRING COMPANY, Appellant.

Money paid by one party, in part performance and in furtherance of a contract in violation of law or of public policy, which is capable of execution by the acts of the parties themselves, cannot be recovered back, where both parties are in *pari delicto*. No distinction can be made between cases of partial and of entire performance; a party cannot revoke what has actually been performed, and from which he may have derived, or from which he sought and expected to derive benefit, and claim a restoration or compensation therefor, on the pretext that he has repented. (DWIGHT, C., dissenting.)

A mere refusal, or neglect, to further fulfill and perform, is not *per se* evidence of repentance, nor does it raise a presumption that an entire fulfillment is withheld, or refused, out of regard for law and public policy.

Where an illegal contract is entered into between a corporation and one of its trustees, who, as such trustee, was moving and active in inducing the action of the corporation, the latter cannot claim that he was not *in pari delicto*, with the former; he is, of the two, the more culpable, and the degree of culpability is not affected by the fact that the contract on the part of the corporation was *ultra vires*. (DWIGHT, C., dissenting.)

Defendant was a corporation, organized under the act for the formation of manufacturing and other corporations. (Chap. 40, Laws of 1848, as amended by chap. 63, Laws of 1863.) Its trustees passed a resolution to increase its capital stock, certificates to be issued as for full paid stock, when eighty per cent of the subscription was paid. A subscription agreement binding the subscribers to take stock, and pay

eighty dollars per share of $100, in installments as called for, and on failure, to submit to forfeiture, was prepared and signed by S. on behalf of plaintiff. Plaintiff was trustee of defendant, was active in devising the scheme and in procuring subscribers. He paid in twenty per cent on said subscription, but did not pay subsequent calls, and in consequence, by resolution of the board of trustees, the stock was declared forfeited. Subsequently, at a meeting of the stockholders, it was resolved to reduce the stock to its original amount, to settle with the subscribers for the new stock, and to retire the same. Bonds of the company were issued and delivered for that purpose; none were tendered to, or demanded by, plaintiff. In an action to recover the amount paid, *held* (DWIGHT, C., dissenting), that the agreement was illegal ; that plaintiff was *in pari delicto* and could not recover.

Also, *held* (DWIGHT, C., dissenting), that, conceding the agreement valid, plaintiff lost whatever rights he acquired under it by the forfeiture of the stock, and could claim no benefit from the subsequent reduction of the capital; also, that such reduction having been made under and in pursuance of the act under which defendant was incorporated, it was not a rescission or revocation of the proceedings for the increase, but recognized the validity thereof, and gave no right or claim for the repayment of the moneys paid toward such increase.

(Argued May 6, 1874; decided September term, 1874.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, affirming a judgment in favor of plaintiff, entered on the report of a referee.

This action was brought for the recovery of money paid by plaintiff, on account of a subscription by C. Sheehan, for and toward the increase of the capital stock of the defendant.

Defendant is a corporation, duly organized under the act entitled, "An act to authorize the formation of corporations for manufacturing, mining, mechanical or chemical purposes" (chap. 40, Laws 1848), as extended in its operation and effect by chapter 63, Laws of 1863. The original capital was $1,000,000, divided into 10,000 shares of the par value of $100 each. It was increased by the addition of $200,000 thereto.

The subscription agreement was in the following words, viz.:

" CONGRESS AND EMPIRE SPRING COMPANY STOCK SUBSCRIPTION.
" We, the undersigned, hereby covenant and agree to take

the number of shares of the capital stock of the Congress and Empire Spring Company set opposite our names respectively, and pay the company, for each share, eighty dollars, in installments as called for by the directors of said company; and if we fail to pay as called-for by said directors, for sixty days after the time it is called for, we agree to forfeit to the company all sums that we have paid on said stock. The Congress and Empire Spring Company agree and bind themselves to pay interest on all sums paid on said stock to the holder from the day it is paid up, to February 1, 1867; and on the 8th day of February, 1867, for all of said stock that eighty dollars has been paid on each share, they agree to issue a certificate to the holder for full paid stock, when the stock shall draw dividends, and be treated the same as other full paid stock. Provided there is any of said stock that there has not been eighty dollars paid to the company, on each share, February 1, 1867, and said stock has not been forfeited to the company, the company shall be bound to pay only the interest on the sums paid on said stock until the first dividend has been declared after eighty dollars has been paid on each share. Said company also agree, that the holders of said stock shall be entitled to vote at all times, the same as full paid stock, provided all calls due have been paid.

"SARATOGA SPRINGS, *February* 8, 1866."

The proceedings for the increase of the stock originated by a resolution, passed by the board of trustees on the 11th day of January, 1866, in the following terms:

"*Resolved*, That the capital stock of the Congress and Empire Spring Company be increased $200,000, for the purpose of building a glass factory for making bottles for bottling the water of .the Congress, Empire and Columbian springs, and creating a working capital. That the books of the company be opened for subscriptions to said stock and that each stockholder be allowed to take one share of said new stock for every five shares he now holds, and that when he pays eighty

dollars on each share, the company will issue to him a certificate as if for full paid stock."

The meeting of the stockholders to vote on the question of increase was held on the 8th day of February, 1866, at which stockholders representing a large majority of the stock voted in favor of the increase; and the board of trustees, on the same day, passed resolutions providing for the opening of the books of the company for subscriptions to such new stock, giving each stockholder the privilege of taking one share of new stock for every five shares of old held by them, provided such new stock was taken, and twenty dollars on each share was paid, on or before February 20, 1866, and providing for the distribution of such shares as had not been taken by any stockholders entitled thereto, and such as the said installment of twenty per cent thereon had not been paid, among the other stockholders. The subscription agreement above set forth was prepared in pursuance of those resolutions, and was, at or about its date, signed by C. Sheehan, among others, as a subscriber for 699 shares of the said new stock. The subscription by Sheehan was made on an understanding, between him and the plaintiff, that the plaintiff would take the stock so subscribed for by him and assume the payment of the sums to be paid therefor, and an agreement to that effect was afterward (by and with the consent of the defendant) entered into between them, carrying out that understanding. Calls were subsequently made by the defendant for the payment of installments on the subscriptions for such new stock; the plaintiff paid the first installment of twenty per cent, amounting to $13,980, called for on the stock subscribed for by Sheehan, as above mentioned, by the application to that amount of a dividend of four per cent, payable on 3,497 shares of the old stock of the defendant held by the plaintiff, under a resolution of the board of trustees, adopted on the 8th day of February, 1866, "that a dividend of four per cent be paid at the office of the company, on the twentieth of February," the balance thereof, eight dollars,

having been paid to Sheehan in cash. The portion of the said dividend was so applied at the request of the plaintiff, who gave Sheehan his note for the amount thereof which was paid before its maturity. Upon such application the secretary of the defendant gave the plaintiff a receipt in the following terms, viz.:

" Office of the Congress and Empire Spring Company, Saratoga Springs, February 20, 1866. $13,980. Received of D. A. Knowlton, Esq., thirteen thousand nine hundred and eighty dollars, it being the first installment of twenty per cent on 699 shares of stock, standing in the name of D. A. Knowlton on the books of the Congress and Empire Spring Company, and said company agrees to pay interest on said $13,980, from this date up to February 1st, 1867, provided the amount now left unpaid on said stock is paid when called for by the directors of the company."

Calls for other installments were afterward made on the said Sheehan and on the plaintiff, but they were not paid, and, thereafter, the stock was, by a resolution of the trustees of the defendant passed on the 25th day of January, 1867, declared to be forfeited by reason of such non-payment.

A meeting of the stockholders of the defendant was subsequently (on the 7th of August, 1867) held, at which a resolution was passed, as follows:

" *Resolved*, That the capital stock of this company be reduced to the original capital of $1,000,000, and that the trustees of the company be and hereby are authorized to adjust with the owners or holders of the 2,000 shares heretofore increased or intended to be added to the capital stock or any part thereof, or with their assigns, for retiring said stock so authorized to be increased on such terms and conditions as the said directors shall deem for the interest of the company."

A meeting of the board of trustees of the said company was held on the same day, at which the following resolution was adopted:

" *Resolved*, That the authority this day conferred upon

this board by the stockholders of this company, in regard to the retiring and cancelling of the stock of this company down to the sum of $1,000,000, is hereby conferred upon the executive committee, and said committee are hereby authorized to adjust the claims of all persons holding receipts for payments on the new stock of the company on such terms, as to price and payment, as shall be deemed by said committee for the best interest of the company."

The said executive committee, on the 27th of March, 1868, adopted the following resolution :

" *Resolved*, That the Congress and Empire Spring Company issue five year coupon bonds of the form adopted at prior meeting in sufficient amount to retire and pay off the outstanding receipts for payments on new stock of the company, which stock was authorized to be retired by vote of the stockholders at the August meeting, 1867 ; and the said bonds are not to be sold or negotiated, in exchange for receipts, at less than par for said bonds."

Such bonds were never tendered to or demanded by the plaintiff, but he demanded repayment of the money so paid by him on said subscription for said new stock before the commencement of this action, of the defendant, which was refused.

Most of the old stockholders became subscribers for the new stock, and all the subscribers therefor other than Sheehan and the plaintiff, as to the subscription of the said Sheehan, and one or two subscribers for small amounts, paid the calls upon them in respect to said new stock. The said first call of twenty per cent was paid mostly by the said dividend; but about $3,000 was paid in cash. All the stockholders who did not subscribe for the new stock were paid their portions of said dividend in cash. About $86,500 of bonds were issued by the company to retire the new stock.

From August, 1865, to August, 1866, the plaintiff was a trustee and the vice-president of the defendant. He actively participated, by advice and counsel, in the proceedings for

increasing its capital stock and preparing and offering the resolution in relation thereto above set forth. He presented and moved the adoption of the said resolution for a dividend, and prepared the said subscription agreement, and signed and advised signatures thereto.

At the close of the evidence, upon the trial, the defendant moved for a nonsuit on the following, among other grounds :

1st. That the proceedings of the defendant in increasing its capital stock and forfeiting the payment made by the plaintiff were regular and valid.

2d. That the plaintiff, by his active participation in the proceedings, is estopped from denying their validity.

3d. If the scheme was illegal, the plaintiff being the contriving agent in devising and carrying out the same while a trustee of the defendant, is *particeps criminis*, and, therefore, not entitled to recover.

4th. That the payment made was a voluntary payment.

5th. That it affirmatively appeared that no money was paid to defendant on the subscription for new stock.

6th. That the plaintiff had failed to prove any cause of action.

This motion was denied and the defendant duly excepted.

The referee found the facts above set forth and, as a conclusion of law, that the plaintiff was entitled to recover the amount paid by him with interest thereon from the time of its payment. Judgment was entered accordingly.

*W. A. Beach* for the appellant. Assuming that the scheme for increasing the capital stock was illegal, plaintiff could not recover. (*Gillett* v. *Phillips*, 3 Kern., 114, 119; *Howson* v. *Hancock*, 8 T. R., 575; *Burt* v. *Place*, 6 Cow., 431.) The courts will not interfere to relieve a participant in an illegal transaction. (*Schermerhorn* v. *Talman*, 14 N. Y., 94, 102, 126, 141; *Tracy* v. *Talmage*, id., 162, 181; *Curtis* v. *Leavitt*, 15 id., 9; *Oneida Bk.* v. *Ontario Bk.*, 21 id., 490, 496; *Nellis* v. *Clark*, 4 Hill, 429; *Smith* v. *Hubbs*, 1 Fairf., 71.) The additional stock authorized by the stockholders' meeting

was valid, and all the corporate proceedings were regular and legal. (Laws 1848, chap. 40, §§ 20, 22; 3 Edm. Stat. at Large, 737; *Leavitt* v. *Palmer*, 3 Comst., 9; *Curtis* v. *Leavitt*, 15 N. Y., 96; *Otter* v. *Brev. Pet. Co.*, 50 Barb., 247.) The provision of law making subscribers liable for the full amount of the par value of their stock is for the benefit of creditors, and no one but a creditor can raise the question. (*Mann* v. *Pentz*, 3 Comst., 415, 422; *Swan* v. *Howard*, 3 Edw. Ch., 287, 289.) Plaintiff having signed the subscription paper himself and induced others to do so, is estopped from questioning its validity. (*Slee* v. *Bloom*, 19 J. R., 456, 460.)

*H. M. Ruggles* for the respondent. The scheme for increasing the capital stock of the company was unlawful. (Laws of 1848, chap. 40, §§ 10, 11, 12, 14, 20, 21, 22.) Plaintiff was not *in pari delicto*. (*Tracy* v. *Talmage*, 14 N. Y., 216, and cases cited.) The contract was *ultra vires* and the corporation was the more guilty party. (12 Wall., 355; 44 N. Y., 92.) The contract was executory. (2 Bl. Com., 443; 2 Steph. Com., 113; Story on Con., § 18.) Plaintiff having rescinded it by refusing to make further payments, the question, as to the degree of culpability or the relations of the parties, is immaterial. (2 Pars. on Con. [1st ed.], 252; Chitty on Con. [11th Am. ed.], 944; *Walker* v. *Chapman*, Lofft, 345; *Lowry* v. *Bourdien*, Doug., 471; *Ins. Co.* v. *Kip*, 8 Cow., 20; *Perkins* v. *Savage*, 15 Wend., 414; *Merritt* v. *Millard*, 4 Keyes, 213; *Sar. Co. Bk.* v. *King*, 44 N. Y., 92; *Skinner* v. *Henderson*, 10 Mo., 207; *Adams Ex. Co.* v. *Reno*, 48 id., 268; *Thomas* v. *City of Richmond*, 12 Wall., 355.)

LOTT, Ch. C. The plaintiff does not, in his complaint, state the specific grounds on which he demands the relief sought by him. He alleges the increase of the capital stock of the defendant; that he paid the first installment of a subscription for and on account of such increase, by C. Sheehan, to the benefit of which he became entitled; and that the defendant thereafter declared the stock to be forfeited by rea-

son of the non-payment of the subsequent installments called for. He does not make any allegation or claim that any of those proceedings were irregular or illegal, or that he made any statement or communication to the defendant why those installments were not paid. He, after making the statements above referred to, sets forth the resolution passed at a meeting of the stockholders for the reduction of the capital stock to its original amount, and conferring authority on the trustees to make an adjustment with the owners or holders of the increased stock, for retiring the same, on such terms and conditions as the trustees should deem for the interest of the company, and then states that provision was made for the issue of coupon bonds to discharge the outstanding receipts for payments made toward the increase of the capital. He does not make any allegation impeaching or questioning that action, but alleges that such bonds were never tendered to or demanded by him; that he had, before the commencement of this action, demanded repayment of the money paid by him on Sheehan's subscription, which it refused to make, and he thereupon demanded judgment therefor.

It is not alleged or indicated in the complaint that he had made any claim previous to the adoption of that resolution for such repayment, or that he at any time offered to surrender or cancel the subscription agreement, or to release or in any manner waive or relinquish his right to the stock subscribed for, or the benefit of such subscription, by Sheehan, or that he asked relief specifically on the ground that the said agreement, or any of the proceedings for the increase or the reduction of the capital of the defendant was illegal or unauthorized. His claim to relief, on the contrary, appears to be based on their validity.

The report of the referee, substantially, finds the facts to be as stated in the complaint, and also shows that the plaintiff actively participated as a stockholder and trustee in the proceedings for the increase of the capital, and prepared the subscription agreement to accomplish that object. He, upon those facts, reached the general conclusion that the plaintiff

was entitled to recover, without any specification of the grounds for such recovery ; and he does not find, as a fact, that there was a non-compliance with the requirements of the law, necessary to effect the increase or reduction of the capital stock of the defendant, or to authorize the forfeiture of the plaintiff's stock; nor is it indicated by any statement in his report that the relief is granted because the subscription agreement was fraudulent, illegal or invalid, for any cause whatever. It appears, however, from the opinion given by him, on the denial of a motion for the dismissal of the complaint, when the plaintiff rested his case, that he considered any plan or scheme by which the actual amount of the capital of a company, incorporated under the act passed February 17, 1848, entitled, "An act to authorize the formation of corporations for manufacturing, mining, mechanical or chemical purposes" (being the act as subsequently extended in its objects, under which the defendant was incorporated), is made less than the nominal amount thereof, whether as originally fixed or subsequently increased, violates the spirit and policy of the law, if not the express provisions thereof applicable to the subject, from its tendency, when carried out, to deceive the public and prejudice the stockholders not assenting to it; and he came to the conclusion, upon facts then disclosed in the case, that the scheme for the increase of the capital stock of the defendant was constructively fraudulent as to the public and as to all stockholders not assenting thereto, and therefore illegal. He then concluded that the plaintiff, virtually, receded from the contract, by refusing to pay calls ; that it was then still executory, and that the plaintiff might repudiate it and maintain an action for the money paid under it. Those views were adopted by him in his opinion, given on rendering his final report and decision ; and he therein further states that the evidence fails to establish an actual intent on the part of the defendant to defraud ; and he also exonerates the plaintiff from intentional fraud in his action in the advancement of the scheme.

No opinion appears to have been given by the General Term

on the affirmance of the judgment entered on the report of the referee. I will, therefore, assume that they adopted that of the referee; and will, in my consideration of the case, first examine it on the assumption that the scheme for the increase of the capital stock and the subscription agreement were, as correctly decided by the referee, illegal, for the reasons stated by him, and hereinbefore referred to.

It is a well settled principle, that where money is paid by one of two parties to the other on an illegal contract, in a case where they may be considered as *particeps criminis*, and *in pari delicto*, an action cannot be maintained after the contract is executed to recover the money back again, for *in pari delicto potior est conditio defendantis.* This is conceded by the counsel of both parties, but it is claimed on behalf of the plaintiff that he was not *in pari delicto* with the defendant. I do not agree with him. It may be conceded that the parties were not equally chargeable with the violation of the law, or alike culpable; but the plaintiff was the most in fault. He was, until a short time before the forfeiture of his new stock, a trustee and vice-president of the defendant, and an active participant and agent in the origin and consummation of the unlawful scheme, in the preparation of the subscription agreement, and in procuring signatures thereto, and nothing appears to have been done for the purpose of carrying out those objects without *his* approbation and consent. The defendant is an artificial body, acting only as moved by its trustees or corporators and stockholders, having no will or capacity to act except through their action and instrumentality; and, although it is liable for all the legal consequences of its transactions, done under their direction and authority, it appears to be a perversion of every rule and principle in determining the relative culpability or fault of parties, to say that a corporation thus acting and impelled to such action is more culpable than a living, intelligent trustee, who was a party moving and active in causing the action to be had; and, in this connection, I will add, that the proposition or point of the plaintiff's counsel, that "the contract was *ultra vires*,"

and, therefore, the corporation was the more guilty party, is not sound. No living or artificial body is authorized to do an illegal act, and an individual is no less guilty in doing what is unlawful than an inanimate or artificial body deriving its existence from legislative action. The views above expressed show that there is no color for holding that the plaintiff, although *particeps criminis,* was not subject to the operation and effect of the principle referred to, on the ground that he was not *in pari delicto.* The referee did not deem it necessary to consider that question, but he based the plaintiff's right to recover upon the ground (now relied on by his counsel) that, after the payment made by him, the illegal contract still remained executory. In support of that view, he stated that the provisions of the subscription agreement declared that a subscriber thereto was not entitled to a certificate, as if for full paid stock, until eighty dollars on each share subscribed for by him had been paid, when the stock should draw dividends, and that interest was to be paid by the defendant on all sums paid toward said stock up to February 1, 1867. He then added : " This shows, I think, that when the plaintiff virtually receded from the contract, by refusal to pay calls, the contract for the new stock was executory, and that much remained to be done to entitle the plaintiff to the stock, or a certificate for it, as provided by the agreement, and the scheme and agreement being illegal, while it remained executory, the plaintiff might repudiate it and maintain an action to recover back all money paid by him under them." This conclusion cannot be sustained. It assumes, as a fact, in addition to those referred to by him as above stated, that the plaintiff had refused to pay the installments subsequent to the first called for, because the said scheme and agreement were illegal, and his refusal was to be considered a repudiation of them. I find nothing to warrant that assumption. It does not appear, as I have before stated, that the plaintiff assigned. any reason for such non-payment ; and as he has never made any offer to return or surrender his receipt for what he had paid, which stated, in addition to the fact of the

payment, that the stock was standing in his name on the books of the company, the inference is more reasonable and just to him that, losing faith and confidence in the speculation, he preferred to abandon it and lose what already had been invested, than run the risk of a greater loss by paying any more money on or under the subscription payable by him. Nor is it correct to say that the contract " remained executory," when there was a default in responding to the calls, by reason of which the stock was forfeited. It is true, that it had not been wholly executed, but it was not *entirely* executory, and there is no more reason for relieving a party from the consequence of a partial than there is of an entire performance of an illegal agreement, and there is no principle on which a distinction can be made. The illegality taints or affects the entire contract, and neither party can invoke the interference or aid of the court for relief from what he has done under it. It leaves both parties where it finds them.

This question was considered by the Supreme Court in *Perkins* v. *Savage* (15 Wend., 412). That was an action of assumpsit for the recovery from the defendant of $500 specified in a receipt given by him to the plaintiff, and for which it was claimed that the defendant should account to him. The case appears to be so similar to the present, in the material points involved and decided therein, that I deem it useful to make a particular reference to the statement of facts set forth in the report of it. After the introduction of the receipt in evidence, which, the circuit judge ruled, on a motion for a nonsuit, bound the defendant to account to the plaintiff for the said sum, the defendant, as the case states, " offered to prove that the $500 specified in the receipt was the balance of $3,000 received by him from the plaintiff for the purpose of enabling him to subscribe for stock of the Utica and Schenectady Railroad Company on the opening of books for subscription to the stock of the company, which subscriptions were to be made in the name of the defendant and in the names of such other persons as he should procure to subscribe, but for the benefit of the plaintiff to whom the stock,

which should be apportioned by the commissioners to the defendant and to such persons as he should procure to subscribe, should be transferred immediately after such apportionment; and that, in pursuance of such agreement, various subscriptions were made, and procured to be made, by the defendant, and that the stock apportioned upon such subscription had been transferred to the plaintiff, leaving the $500 specified in the receipt unaccounted for by the defendant to the plaintiff. Part of the evidence offered consisted of letters from the plaintiff to the defendant."

The counsel for the plaintiff objected to the introduction of such evidence and the judge rejected it, "deciding that it was inadmissible, that the evidence would not show a transaction prohibited by law or a transaction so far illegal or improper as to preclude the plaintiff from recovering back the money advanced to the defendant."

The jury, thereupon, rendered a verdict in favor of the plaintiff. A new trial was granted by the Supreme Court, NELSON, J., giving the opinion. He concludes, after a reference to and examination of several authorities, with this remark: "The cases abundantly show the contract under consideration to be illegal, whether considered a violation of a positive provision of the statute or of the spirit and policy of it," and with the declaration that the action could not be sustained. The result of the opinion and decision is briefly stated in the head-note of the case in these terms: "Where a contract is entered into between two parties, the object of which is to violate the provisions or the spirit and policy of a public statute, and one pays money in furtherance of such contract and the contract is, in part, executed by the accomplishment, in part, of the original design, leaving, however, a portion of the money advanced unexpended, an action will not lie to recover back the unexpended balance." One of the cases cited by the learned judge was that of *Bell ex parte* (1 M. & S., 751), in which Lord ELLENBOROUGH, after referring to the facts therein, said: "This is clearly an attempt to recover back money advanced for the furtherance

and in the very execution of an illegal contract," and held that it was not recoverable. This principle is also declared by Lord KENYON, in *Howson* v. *Hancock* (8 Term, 575). He there says: "No case can be found where, when money has been actually paid by one of two parties to the other, upon an illegal contract, both being *particeps criminis,* an action has been maintained to recover it back again." And that language was adopted by Chief Justice SAVAGE in *Burt* v. *Place* (6 Cow., 431); and he added: "This doctrine has been since repeatedly recognized, and I know of no case containing a contrary doctrine."

The authorities relied on by the appellant to show that he, by his refusal to make further payments, was entitled, to recover where there has been a rescission of the contract, when still executory (supposing that under consideration to be such), on the principle that a party can avail himself of a *locus penitentiae* to retrace his steps and disaffirm the unlawful agreement, has no application to this case. The recovery in some of the cases cited was permitted on the ground that the contracts were wager or gambling contracts, or of that character where the benefit to be received by the party paying the money was dependent on a future contingent event, not under the control of the party to whom the payment was made, or capable of performance by his own act. And the claim to recover back the money paid, or the deposit, as it is termed in some of the cases, was made before the event contemplated had happened. In other cases, the parties stood in such a relation that one was considered to have paid his money under oppression or extortion, or some other circumstance, showing an inequality of position, by reason of which an improper influence or control was presumed to have been exercised over him by the other party; and the rest were cases where the illegality of the contract arose from a positive prohibition of law imposed on one of the parties to it. Such were the cases of *Schermerhorn* v. *Talman* (14 N. Y., 93); *Tracy* v. *Talmage* (id., 162), and *Curtis* v. *Leavitt* (15 id., 9),

and *The Oneida Bank* v. *The Ontario Bank* (21 id., 490, etc.), cited by the referee in one of his opinions. And such is the case of *White* v. *Franklin Bank* (22 Pickering, 189, etc.). The parties in those cases were not considered as *in pari delicto*. We have not been referred to any authority, nor have I found any, where money, paid in part performance and in *further- ance* of an illegal contract, has been recovered back, where both parties were *particeps criminis* and *in pari delicto*, and where its execution was in the control of the contracting parties themselves. There are, I concede, *dicta* and declara- tions, in some of the elementary works, where the contrary rule or principle is, apparently, laid down without limitation or restriction; but it will be found that the cases cited to support them are of the nature or character to which I have above referred, and do not sustain the proposition or princi- ple that a party to an illegal contract, capable of execution by the acts of the parties and in which he is *in pari delicto*, can, after part performance and execution, on a refusal by him to fulfill and perform what remains to be done, revoke and nullify what has been actually performed, and from which he sought or expected to derive benefit and advantage, and in fact may have done so, and claim a restoration or compensa- tion therefor from the other party, on the pretext or ground that he has become repentant of his conduct at the particu- lar time, when he is required by the terms of his contract to do some further act which, most probably, his interest or want of means, or apprehension of loss from its further prosecution induces him to repudiate. A mere refusal or neglect to fulfill is not *per se* evidence of repentance, nor does it raise a presumption that an entire fulfillment of a contract in violation of a law or of public policy, deliber- ately entered into and partially executed, is withheld or refused by a respect and regard for law and the public wel- fare. The distinction to which I have referred, where parties are *in pari delicto*, and where they are not, and in the cases where a recovery has been allowed, is recognized in the opinion of LEONARD, C., in *The Saratoga County Bank* v.

*King* (44 N. Y., 87, *et seq.*).    And the rule distinguishing between executory and executed contracts is referred to by WAGNER, J., in *Adams Express Company* v. *Reno* (48 Mo., 267), cited by the appellant.    He, after speaking of the contract which was the subject of discussion therein, but which was wholly unexecuted, as void against public policy and incapable of enforcement by the courts, says that, "where parties have been guilty of turpitude in entering into illegal agreements, or have performed acts which are stigmatized as against public policy, the courts of the country furnish them no redress; but, if propositions have been made contemplating such purposes, but *nothing has been done* to finally accomplish or consummate them, they stand in a very different attitude.    The moral stain has not attached, and the guilt has not been carried out; and, although these remarks are followed by the general statement that the doctrine applies solely to executed contracts, his meaning, construed in connection with the context, shows that he intended it to apply to those partly as well as those entirely executed.

I will conclude the examination of the branch of the case now under consideration, by the citation of the principle applicable to contracts of a fraudulent or illegal character, declared by Chief Justice MELLEN, in a well reasoned opinion, in the case of *Smith* v. *Hubbs* (1 Fairf. [10 Me.], at 76), which was approved by Chancellor WALWORTH in his opinion delivered in *Nellis* v. *Clark* (4 Hill, 429).    It is in the following terms: "There is a marked and settled distinction between executory and executed contracts of a fraudulent or illegal character. Whatever the parties to an action have executed for fraudulent or illegal purposes, the law refuses to lend its aid to enable either party to disturb. Whatever the parties have fraudulently or illegally contracted to execute, the law refuses to compel the contractor to execute or pay damages for not executing, but in both cases, leaves the parties where it finds them. The object of the law in the latter case is, as far as possible, to prevent the contemplated wrong; and, in the former, to punish the wrong-doer by leaving him to the consequences of

his own folly or misconduct." By the application of that principle to the present case, the plaintiff, on the one hand, is prohibited from recovering the sum he has paid, and the defendant could not have recovered the unpaid balance on the subscription payable by him.

I will now briefly consider the case, on the assumption that the contract was valid, as there seems some color for holding by the opinion of LEONARD, P. J., in *Otter* v. *Brevoort Petroleum Company* (50 Barb., 255). Whatever rights the plaintiff acquired under it were lost by the forfeiture of his stock, on his failure and default in making the second and subsequent installments previously called for; and, by the terms of the subscription, the subscribers agreed to forfeit to the company all sums that they had paid on the stock subscribed for, and the act under which the defendant was organized also authorized such stock, and all previous payments made thereon, to be forfeited on a failure to pay any installment. There is no question as to the regularity or legality of the proceeding of the defendant in declaring such forfeiture. The plaintiff thereupon ceased to have any rights or interest in the company, and consequently could claim no benefit from the subsequent reduction of the capital, and the resolution authorizing an adjustment and settlement to be made with the owners or holders of the new stock for the cancelment thereof. If it were otherwise, he states in his complaint that he never made any demand for the coupon bonds, which were authorized to be issued and given for the purpose of such adjustment. It may be proper to add, that the reduction of the stock was not a rescission or revocation of the vote for its increase, nor of the subscription. The act of 1848, above referred to, expressly authorized a reduction of the capital by companies organized under it, on the terms and conditions therein specified; and that of the defendant was made under and in pursuance of such authority. The proceeding was based on the assumption and recognition of the validity of the previous increase, and gave no right or

any claim for the repayment of the moneys paid toward such increase.

It follows, from these considerations, that the referee erred in deciding that the plaintiff was entitled to a recovery, and the judgment entered on his report, and that of the General Term in affirmance thereof, must both be reversed, and a new trial must be ordered, with costs to abide the event.

Reynolds, C.    I find it difficult to see upon what principle the referee gave judgment for the plaintiff in this action. His opinion shows that the operations of the defendant to increase its capital stock were all illegal and fraudulent in every form, and that the plaintiff was the inventor and promoter of the fraud, and the evidence in this respect justifies the conclusion. The defendant, being a corporation, is an intangible thing, incapable of thought or action, except that, in the fiction of the law, it may acquire rights, or incur responsibilities, as those who are appointed to control it may, in their judgment, determine. In this case the plaintiff was a corporator, a trustee, and the vice-president of the defendant's company when the various transactions were had now in controversy. There appears to be no ground for recovery, upon the assumption that the effort of the defendant to increase its stock was valid. The judgment must have proceeded upon the ground, and it is so argued by counsel for the plaintiff, that all proceedings had in that regard were illegal, fraudulent and void. We now assume, as we must do, that such is the fact, and add, as is also the fact, that the plaintiff was the orginator, advocate and party to the fraud.

It is very obvious, from the whole case, that the dividend sought to be recovered in this action was declared in aid of the unlawful effort to increase the capital stock of the corporation, and was employed as a part of the means by which the illegal transaction was to be consummated. While the findings of the referee are not very explicit upon any subject, it is quite apparent from the evidence, that the dividend would not have been then declared, except with reference to the

increase of the capital stock under the scheme invented by the plaintiff. The incident is very striking, that the dividend of twenty per cent represents the exact difference between the par value of the increased stock and the sum to be actually paid for it. It cannot, I think, be doubted, that the dividend was made in aid of the illegal scheme to increase the capital stock of the corporation, and it may be unfortunate for the plaintiff, that his action is brought to recover the exact amount of that dividend declared upon the stock of Sheehan, borrowed of him for the purpose of furthering the unlawful increase of the capital stock of the defendant. I do not think it of much consequence to the present question that the defendant abandoned the effort to increase its stock as originally proposed by the plaintiff. The infirmity, if there be any in the plaintiff's case, is, that he was a party to an illegal transaction, and the money sought to be recovered was connected with the illegality, and intended to aid in promoting the fraudulent enterprise. It is urged, on behalf of the plaintiff, that he was not *in pari delicto;* that the corporation was the more guilty party; that he was but one of a number of directors and did not control the action of the company, and that he repented in due season. I find it difficult to see the force of this argument. He was one of several officers of a corporation engaged in an illegal act, and he may be no worse off in the law, even if he was the inventor of the illegal scheme, but he was in complicity with all his associates in the direction of the corporation. The invisible and intangible legal existence, called the corporation, had neither body, soul or sense, and in itself was utterly incapable of conceiving a fraud or doing an illegal act. It could only be moved to wrong by the acts of its managers, and if they all concocted or connived, and sought to consummate an illegal transaction, they all come within the unbending rule that every court declines to give its aid, in any form, to parties thus conditioned, either to enforce an executory contract or disturb one executed. Such parties are left in the position they have placed themselves. It is said the plaintiff repented

in season. Repentance for transgression of any kind is always to be commended, but in cases like this the courts do not accept it to relieve the sinner. If he has been concerned in an illegal enterprise, abhorred by the law, and parted with his money on such a hazard, no amount of repentance will induce a court to give its aid to rescue it from the toils by which it is detained. The learned counsel for the plaintiff obviously felt the force of this rule of law, when he suggested that the corporation was the more guilty party. No guilt can be imputed to the corporation, save that imposed by the plaintiff and his associates. And, again, it is said that the plaintiff rescinded his illegal contract and was entitled to recover back what he had paid. There is no such rule in a case like this. A party defrauded may, on the discovery of the fraud, rescind a contract to recover back what he has paid upon it. But one of several parties to a fraud, after he has parted with his money to promote the fraudulent scheme, may not, at any time, rescind and recover it back.

As before suggested, it is very earnestly insisted that in this case the plaintiff's illegal contract remained executory, and that he rescinded or repented in due time before it was completely executed, and was therefore entitled to recover back so much as he had already paid in furtherance of the illegal transaction. I am quite aware that cases can be found in the books where this distinction has been acted upon, but they will be found, on examination, mainly exceptional in their character. In our law, the general rule is, that no court will give its aid to any party engaged in an illegal transaction, to recover anything which has been devoted to such a purpose. Where the illegal and immoral scheme has been fully consummated, no one doubts the application of the rule. It has been, however, and is now suggested, that if a party only goes half way and then repents, he may have relief in the courts, on the ground of his repentance, before the eleventh hour. This view can only proceed upon the ground that the law indulges in some mathematical exactness in the degrees of criminality, and that the smaller sinner may be saved, while

the larger one meets with a different destiny. It therefore appears to me that, in cases like the one at bar, there can be no logical or legal distinction made between a contract executory or executed, as I think my brother LOTT has shown by a special reference to adjudged cases, which I do not think necessary now to review or consider. The principle which underlies the whole question is, to my mind, very apparent.

We are referred to cases where corporations have done acts, such as the making of contracts, and the issuing of bills as money, entirely beyond their authority, but in fact prohibited by positive law, and where a remedy, by third parties, has been had against them in the courts; but they give no support to the plaintiff's claim in this case, for here the illegal or guilty act of the corporation was also the illegal or guilty act of the plaintiff, by whom, with his associates, the corporation was debauched. The case of *Thomas* v. *The City of Richmond* (12 Wallace [U. S.], 349) was a case where a third party had received bills, issued as currency in violation of law, and the plaintiff was not permitted to recover. Mr. Justice BRADLY, in that case, says (p. 356): "The issuing of bills as a currency by such a corporation, without authority, not only contrary to positive law, but, being *ultra vires*, is an abuse of the public franchises which have been conferred upon it; and the receiver of the bills, being chargeable with notice of the wrong, is *in pari delicto* with the *officers* and should have no remedy, even for money had and received, in which he has aided in inflicting the wrong. The protection of public corporations, from such unauthorized acts of their officers and agents, is a matter of public policy in which the whole community is concerned, and those who aid in such transactions must do so at their peril." It need not be suggested with how much greater force this doctrine applies against one of the guilty officers of the corporation. Without pursuing the subject further, I think the judgment of the court below should be reversed and a new trial granted.

DWIGHT, C. (dissenting).   The questions in this case arise under the provisions of the manufacturing act of 1848, chapter 40, and amendatory acts, relative to subscriptions for, and the increase of, capital stock.   The fourteenth section of the act asserts that nothing but money shall be considered as payment of any part of the capital stock.   The eleventh section provides that where the original stock is made and paid in, a certificate to that effect is to be made.   The tenth section declares that the stockholders shall be, severally, individually liable to creditors, till the *whole amount* of capital stock fixed by the company shall be paid in.   The twenty-second section provides a mode of increasing the capital stock, and requires that a certificate shall be filed showing a compliance with the provisions of the act, the amount of capital actually paid in, the amount to which the capital stock shall be increased or diminished, and the business to which the capital is to be applied.   When this is done, the company is entitled to the privileges and benefits and subject to the liabilities of the act.   Collating all the provisions of the statute, it is manifest that it was the intent of the legislature, both as to the originally subscribed stock and as to its increase, that the *whole amount* should be paid in, and that it should all be paid in cash, except so far as such payment is dispensed with under the terms of chapter 333, of the Laws of 1853 where there is a purchase made by means of stock of mines, manufactories and other property necessary for the company's business.

Notwithstanding these provisions, the trustees of the company, defendant in the present case, resolved January 11th, 1866, that its capital stock be increased $200,000, for the purpose of building a glass factory to make bottles to be used in their business, and for a working capital, and that each stockholder be allowed to take one share of stock for every five shares he then held, and that when he paid eighty dollars on each share of $100, the defendant would issue him a certificate for full paid stock.   This resolution was ratified at a meeting of stockholders, held February 8, 1866, by a

very large majority.   The board of trustees on the same day made a call of twenty per cent, giving the privilege to each stockholder to take his proportionate part of the stock on or before February twentieth, provided that he paid twenty dollars on each share — otherwise his claim to the stock should be forfeited.   Another resolution was passed on the same day allotting such stock as was not taken by any shareholder under the former resolution, to such other shareholder as might take it and pay a specified sum within a prescribed time.

A subscription agreement was also drawn, bearing the same date (February eighth), binding subscribers to take stock and pay eighty dollars per share, in installments as called for by the directors, and on failure to pay for sixty days, to submit to a forfeiture.   The defendant, in turn, agreed to pay interest on sums paid to February 1, 1867, and whenever eighty dollars a share had been paid to issue a certificate for full paid stock, and the holder of that stock was to be treated in all respects as though he was a holder of full paid stock. Under this agreement, one C. Sheehan subscribed for 699 shares of this stock, for the plaintiff's benefit.   The latter paid, in a mode to be hereafter considered, the first call of twenty per cent, and received from the defendant's secretary a receipt, dated February twentieth, stating that this sum had been paid, amounting to $13,980, on 699 shares of stock standing in plaintiff's name, as being the first installment of twenty per cent.

Under this state of facts, it is claimed by the plaintiff that this transaction was illegal, as subverting the policy of the statute already considered, and that as the contract had not been fully performed, it was still executory in its nature. There was thus a *locus penitentiae* on the part of the plaintiff, and he might recover back his money.   It may be that this is true; but the more correct principle seems to be, that it is a contract *ultra vires*, or beyond the capacity of the corporation to make.   In other words, it is no contract.   The rule that illegality is a defence to an action on a contract,

presupposes that without that element it is a contract, or made by parties capable of contracting. Where there is no capacity to contract, a party may recover back money paid on the bare ground of failure of consideration.

It is a general rule of corporation law that payment for original stock on a subscription must be made in money only. (*Pittsburg and Connellsville R. R. Co.* v. *Stewart*, 41 Penn. St., 54.) So it cannot issue such stock below par. (*Neuse River Nav. Co.* v. *Comrs. of Newbern*, 7 Jones' Law [N. C.], 275 ; 1 Redf. on Railways, 221, 222.) Much more must this be so if the plain language of the statute requires full payment in money as in the present case. To make a subscription valid there must be mutuality. The criterion of the liability of a subscriber is whether any act has been done by which the company could be *forced* to receive him as stockholder. (Angell & Ames on Corporations, §§ 255, 527.) The case of *Union Turnpike Company* v. *Jenkins* (1 Caines, 381 ; S. C., 1 Caines' Cases in Error, 86) is much in point. In that case the act, so far as it affected the mode of taking subscriptions, was not complied with, and the court held that there was no consideration for the promise to take the stock. There was, in fact, no contract. This rule was followed in *Hibernia Turnpike Company* v. *Henderson* (8 Serg. & Rawle, 219). The company could introduce no one as a member, except in accordance with the act of incorporation. If the subscriber got no right which he could have enforced as against the will of the plaintiff, he incurred no responsibility. Unless the corporation is bound the subscriber is not. (*Pittsburg, etc., R. R.* v. *Stewart*, 41 Penn. St., 54.) Where money has been paid on a contract that is merely void as distinguished from one that is illegal, it can be recovered back. (*Jaques* v. *Golightly* [per Sir W. BLACKSTONE], 2 W. Black., 1073 ; *Eno* v. *Woodworth*, 4 N. Y., 249.)

The fact that the whole act of the corporation is *ultra vires* may be shown from another point of view. As soon as the money of the plaintiff was paid over to the defendant it held it in the character of trustee. The ordinary relation of debtor

and creditor was not created, but that of trustee and *cestui que trust.* The defendant could only use the money as increasing its capital stock. It is now settled that a corporation cannot use corporate property considered as trust funds in a manner not authorized by law, even with the consent of the *cestui que trust,* and that the court will still enforce the trust as against the corporation. (*Great Eastern R. R. Co.* v. *Turner,* L. R. [8 Ch. App.], 149.)

There is a class of cases where the courts have held that a subscriber to stock should not, so as to affect the rights of third persons, be allowed to make a defence as against the company that there were special arrangements made as to taking stock which the company had no right or power to enter into and thus make his subscription void. These, however, are cases where the transaction, *on its face,* appeared to comply with the law, and there was a secret understanding between the corporation and the subscriber that his subscription should not have the effect which it appeared to have. Though such an arrangement might be a fraud on other subscribers, and even relieve them if they desired (*New York Exchange Co.* v. *De Wolf,* 31 N. Y., 273; 1 Redf. on Railways, 173), yet it could not be claimed by the party who participated with the corporation in the secret and wrongful act that he should be relieved. (*Preston* v. *Grand Collier Dock Co.,* 11 Sim., 327; *Mangles* v. *Same,* 10 id., 519; *Blodgett* v. *Morrill,* 20 Vt., 509; *Henry* v. *Vermillion R. R. Co.,* 17 Ohio, 187; *White Mountains R. R. Co.* v. *Eastman,* 34 N. H., 124; *North Shields Quarry Co.* v. *Davidson,* 4 Kay & Johns., 688.) These cases are governed by the general doctrines of estoppel *in pais.* They are, in the main, cases of sham or colorable subscriptions, fraudulent as to other subscribers and the public at large.

Nothing of this kind can be urged in the present case, as the whole transaction appeared on the face of the subscription paper, and all the stockholders were made aware of it. No claim is made on behalf of creditors. Wherever a contract of a corporation is *ultra vires* it is only binding in favor of

persons who may base action on the faith of it. Thus it has been said, if a railway company were to contract for 1,000 gross of green spectacles the contract would be necessarily void, but if it were to buy iron rails that it did not need the contract might be binding in favor of persons not cognizant of the true state of facts. (Fry on Specific Performance, 152, and cases cited.)

But, even if it be conceded that there is an element of illegality in the case, it does not follow, for that reason, that the plaintiff is, necessarily, precluded from recovery. It is undoubtedly true, that wherever the recovery of the money requires the enforcement by the court of any of the unexecuted provisions of the illegal contract, no action can be maintained. (*Woodworth* v. *Bennett*, 43 N. Y., 273; *Gray* v. *Hook*, 4 id., 449.) But where the action is brought on the theory of disaffirmance of a contract that is not yet fully executed, there is a *locus penitentiae*, and the money paid under the contract may be recovered back. The rule is well stated in 2 Comyn on Contracts, 109: "Where money has been paid under an illegal contract, it is a general rule that, if the contract be executed, and both parties are *in pari delicto*, neither of them can recover from the other the money so paid; but if the contract continues executory, and the party paying the money be desirous of rescinding it, he may do so, and recover back his deposit. And this distinction is taken in the books, namely, where the action is in affirmance of an illegal contract; and, clearly, such an action can in no case be maintained, but where the action proceeds in disaffirmance of such a contract, and instead of endeavoring to enforce it, presumes it to be void, and seeks to prevent the defendant from retaining the benefit which he derived from an unlawful act, there it is consonant to the spirit and policy of the law that the plaintiff should recover." (*Jaques* v. *Withy*, 1 H. Black., 67.) In accordance with this view, Lord Mansfield said, in *Walker* v. *Chapman* (Lofft, 342): "There is a great difference where a party comes to overturn an illegal contract and to be relieved against it. He shall not

be relieved if he comes to take the benefit of an illegal contract; there he never shall be relieved, because, to relieve him the court must affirm the contract." (P. 345 ; see, also, *Tappenden* v. *Randall*, 2 Bos. & Pull., 467 ; Chitty on Contracts, p. 533 ; *White* v. *Franklin Bank*, 22 Pick., 184 ; *Aubert* v. *Walsh*, 3 Taunt., 277 ; *Busk* v. *Walsh*, 4 id., 290 ; *Williams* v. *Hedley*, 8 East, 380, *n.* ; *Hastelow* v. *Jackson*, 8 B. & C., 224.) The principle was recognized and approved in the case of *Utica Insurance Company* v. *Kip* (8 Cowen, 20), though the decision of the case did not turn upon it.

The ground of the doctrine is that the party, before the contract is wholly executed, elects to rescind it. (*Busk* v. *Walsh, supra ; Hastelow* v. *Jackson*, 8 B. & C., p. 224, per Bayley, J.) Littledale, J., said : "If two parties enter into an illegal contract, and money is paid upon it by one to the other, that may be recovered back before the execution of the contract, but not afterward." (P. 226.)

In the present case the contract remained in part unexecuted. It was, in the sense of the cases above cited, " executory." There remained something to be done both on the part of the plaintiff and defendant. The plaintiff was still to pay additional installments, and the defendant was to give a certificate of stock when the eighty per cent was paid. A contract may be partly executed and still remain in part executory, as where a part is entirely performed and a portion of the price paid, and another portion remains to be completed and its equivalent consideration to be paid. So, it may be executed on one side and executory on the other, as where one of the parties, for the sum received, agrees to do some future act. (Story on Contracts, §§ 18, 19, 20.) In *White* v. *Franklin Bank* (*supra*) the contract was regarded as executory, because a sum of money to be paid by one of the parties was not yet due. (P. 190.) Here an act remained to be done — the giving of the certificate. No demand was necessary prior to recovery. (Same case.)

The case of *Perkins* v. *Savage* (15 Wend., 414) is not opposed to these views. The head-note of the reporter is

inaccurate.   A short statement of the facts is, that the plaintiff gave the defendant $3,000 in furtherance of a scheme to
obtain allotments of stock in a projected railway company, in
fraud of the policy of the statute.   The allotments were
made, the stock paid for, and the certificates made over to
the plaintiff.   Nothing whatever remained to be done by
the defendant or plaintiff.   The former simply had a surplus
in his hands of $500, a portion of the $3,000 which remained
unexpended.   The action to recover this $500 was plainly in
affirmance of the illegal contract.   If the contract had been
legal, it would clearly have been collectible under the contract.
That was wholly executed.   This was the ground of the
decision as stated by NELSON, Ch. J., on pages 414 and 415
of the report: "This is not an attempt by the plaintiff to
avail himself of a *locus penitentiae* to retrace his steps, and
disaffirm an unlawful proceeding while it is yet executory;
the illegal purpose or act has been executed, and the
effect of a recovery is to enable him to realize a part of the
fruits of it by enforcing a performance by the defendant."
The action being thus brought in disaffirmance of the
original contract, the plaintiff may recover.   Even where the
illegal contract is executed, money may be recovered back on
a ground which does not involve reliance on the contract.
Thus, in *Catts* v. *Phalen* (2 How. [U. S.], 376) it was held,
that though a lottery ticket had been sold contrary to law,
and a prize had been awarded to a purchaser, yet as he had
obtained the prize through fraud, the money might be
recovered back by the lottery dealers.   In that case, the fraud
annulled the contract, and left the case one simply of payment without consideration.   So in the case at bar, the party,
by his own act, before performance, rescinds the contract, and
leaves the matter as though the contract had never existed,
and recovers on a similar principle.   In other words, illegality is a good ground for a party to rescind a contract, while it
remains executory.   This rule is peculiarly applicable to the
case of fiduciary relations, such as the present, or to the
cognate case of partnership.   Thus it is laid down in Lindley

on Partnership, page 155, " that, although the subscribers to an illegal company have not a right to an account of the dealings and transactions of the company, and of the profits made thereby, they have a right *to have their subscriptions returned;* and even though the moneys subscribed have been laid out in the purchase of land and other things for the purpose of the company, they have a right to have that land and those things reconverted into money, and to have it applied, as far as it will go, in payment of the debts and liabilities of the concern, and then in repayment of the subscriptions.   In such cases *no illegal contract is sought to be enforced, but, on the contrary,* the *continuance of what is illegal is sought to be prevented."* Citing *Harvey* v. *Callett* (15 Sim., 332); *Butt* v. *Monteaux* (1 K. & J., 98); *Sheppard* v. *Oxenford* (id., 491).   In the last case the court said, that the defendant, having raised the question of illegality, could not dispute the trust on which he had received the property.   This case was one of a joint stock company, and, in its principles, closely resembles that at bar.

There is still another reason why the defendant is liable, even though there was in the transaction an element of illegality.   It, by its own act, rescinded the whole scheme, under which the plaintiff subscribed for its stock.   It cannot be supposed that he or Sheehan would simply have taken 699 shares of stock on the hypothesis that no more was to be in existence.   It was only as a part of a larger plan, whereby "working capital" was to be supplied.   When the defendant rescinded its scheme for the increase of stock, its action related back to its inception.   Finding that the increase was irregular and unauthorized, it wisely determined to retrace its steps, and to treat the whole transaction as nugatory and void.   Accordingly, there never was any stock.   When a corporate project is thus abandoned, the consideration on which any money has been paid wholly fails, and, on general principles of law, the owner must be entitled to recover it. It is immaterial that the so-called stock was forfeited for the non-payment of calls.   That forfeiture was based on the

theory that there was stock in existence. When the plan for increase was abandoned, the result was that there had been no stock issued, and the defendant held the plaintiff's money without consideration. It is true that, at a meeting of stockholders held August 7th, 1867, it was resolved to "reduce" the capital stock to the original amount of $1,000,000. The whole transaction, however, shows that there was no true reduction, since the resolution simply retired the specified stock, which had appeared to be added. If there had been an actual increase of stock, the new would have been mingled with the old, and the one would have been *reduced* as much as the other. The fact that the new stock was taken solely for the purposes of reduction, shows that, in the minds of the stockholders, it had never been really added to the capital, and that instead of a reduction of stock, there was simply an abandonment of an unsuccessful project.

There is nothing in the point that the plaintiff participated in the increase of stock as a trustee or stockholder and is, therefore, precluded from questioning its validity in any manner. The defendant is now acting adversely to him, and cannot claim the benefit of his acts, except by taking them with all their qualifications. It seeks to hold him as a contracting party, and the transaction must have, as in other cases, all the elements of a contract.

The defendant, finally, objects that there was nothing paid by the plaintiff, It is urged that the dividend was a fictitious one, not being based on values in possession of the defendant. The plaintiff bought the dividend of Sheehan, paying its full value. The defendant recognized the plaintiff's title, and treated him as owner. Moreover, other stockholders received from the defendant equivalents for their dividends in the company's bonds, which were subsequently paid. It is now too late to question the fact, that the dividend belonging to the plaintiff must be regarded as money in the possession of the defendant for the plaintiff's use.

The judgment of the court below should be affirmed.
All concur for reversal, except DWIGHT, C., dissenting.
Judgment reversed.