THOMAS H. UNCKLES, Appellant, v. ROMULUS R. COLGATE and Others, Respondents.

*Trust, contrary to public policy — an action for an accounting by such trust will not lie on behalf of a certificate holder — courts will not enforce an accounting among the parties interested in an agreement contrary to public policy.*

In an action brought by the holder of certain certificates issued by the National Lead Trust to compel the defendants, as trustees thereof, to account, the complaint did not allege that the plaintiff's certificates were issued to represent the stock of one of the constituent companies, which had turned in their assets and stock to the trust, or for value paid the trust, and it was conceded by the plaintiff that the trust was against public policy, and the agreement creating it unlawful.

On appeal from a judgment sustaining a demurrer interposed to the complaint, on the ground that it did not state facts sufficient to constitute a cause of action, and because of a defect of parties,

*Held*, that a court of equity would not interfere to determine the rights of parties arising out of an unlawful agreement, and that this suit was based on such an agreement;

That this action would not lie to recover value paid on account of an unlawful executory contract, as the complaint did not allege that any such value had been paid to the defendants.

APPEAL by the plaintiff, Thomas H. Unckles, from a final judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the city and county of New York on the 6th day of February, 1893, and from a decision made at the New York Special Term on the 19th day of December, 1892, and an order made at the said Special Term and entered in said clerk's office on the 3d day of February, 1893, sustaining the defendants' demurrer to the complaint, and directing a final judgment.

On the 1st day of October, 1887, certain manufacturing corporations, their shareholders, and certain firms then engaged in manufacturing and selling lead and all of its products, entered into a written agreement, of which the following is a copy of the material parts:

"WHEREAS, It is designed to form a trust, known as the National Lead Trust, for the purpose of securing intelligent co-operation in the business of smelting, refining, corroding, manufacturing, vending and dealing in lead and all its products, and carrying on all other business incident thereto:

"THEREFORE, It is mutually agreed by all who may sign this agreement, or become at any time the holders of the certificates of trust herein provided for, as follows:

" *First.* The trust herein created shall be vested in nine trustees.

" *Second.* Henry Hentz, W. H. Thompson, C. F. Wells, are hereby appointed trustees, to hold their office until the first Wednesday in February, A. D., 1888.

" *Third.* J. A. Dean, D. B. Shipman, S. Beymer, are hereby appointed trustees, to hold their office until the first Wednesday in February, A. D., 1889.

" *Fourth.* S. R. Bradley, A. T. Goshorn, W. H. Pulsifer, are hereby appointed trustees, to hold their office until the first Wednesday in February, A. D., 1890.

" *Fifth.* The trustees shall prepare certificates which shall show the interest of each beneficiary in said trust, and deliver them to the persons entitled thereto. The certificates shall be divided into shares of the par value of one hundred dollars each, and shall be known as the National Lead Trust certificates. The trustees shall have power to agree upon and direct the form and contents of said certificates, and the mode in which they shall be executed, attested and transferred. The certificates shall contain an express stipulation that the holders thereof shall be bound by the terms of this agreement and by the by-laws herein provided for.

" *Sixth.* No certificate shall be issued except for bonds and stocks as herein provided. The certificates shall be the best evidence of the amount of interest of the beneficiaries in this trust. No duplicates shall be issued by the trustees except upon surrender of the original certificate for cancellation, or upon satisfactory proof of the loss thereof and the giving of satisfactory bond of indemnity.

" *Seventh.* Each subscriber hereto agrees to assign and transfer to said trustees the number of shares of capital stock of the particular corporation or corporations indicated by the memorandum accompanying his signature hereto, in consideration of which said trustees do hereby agree to execute and deliver to each subscriber trust certificates as above specified, for the number of shares the par value of which shall represent the agreed value of the stock so delivered. The value of the capital stock of any corporation whose stock shall be assigned to said trustees shall be first agreed upon between said

trustees and stockholders willing to transfer the same, and after it is agreed upon there shall be no discrimination in the purchase price thereof as between stockholders of the same corporation transferring their shares at the same time.

"*Eighth.* This agreement shall take effect as soon as those holding a majority of stock in the following corporations, to wit:

"Anchor White Lead Co.

"The Bradley White Lead Co.

"St. Louis Lead & Oil Co.

"St. Louis Smelting & Refining Co.

"Brooklyn White Lead Co.

"Jewett White Lead Co.

"D. B. Shipman White Lead Works.

"The J. H. Morley Lead Co.

"Beymer-Bauman Lead Co., have subscribed to this agreement to transfer the same to said trustees. Thereafter the said trustees and their successors shall have power to purchase other stocks and bonds of the same companies, or of companies organized for conducting the same business or any of the businesses hereinbefore specified, and may issue therefor certificates of trust equal at par value to the agreed value of the stocks or bonds so purchased.

"*Ninth.* All stocks and bonds sold and transferred to said trustees shall be held by them and their successors for the benefit of all the owners of said trust certificates. No stocks so held by said trustees shall be sold or surrendered by said trustees during the continuance of this trust without the consent of a majority, in number and value, of the holders of trust certificates; provided, however, that said trustees may, from time to time, assign such shares of stock as may be necessary to qualify any person or persons chosen, or desired to be chosen, as directors of any companies the stocks of which are held by said trustees.

"Bonds held by said trustees may be sold by them.

"*Tenth.* The said trustees shall have power to cause corporations to be formed for the purposes, and with all or any of the powers, specified in section first of this agreement; provided, that the stock of such corporations shall be issued for cash, or for property at cash value, and shall be issued to, or be purchased by, said trustees in the manner provided in section eight of this agreement.

" *Eleventh.* Said trustees shall receive and safely keep all moneys received from dividends or interest upon stocks, bonds or moneys held in trust, and shall distribute the same, as well as moneys received from sales of trust property, by declaring and paying dividends upon said trust certificates, as funds accumulate which are not needed for the uses and expenses of the trust. The trustees shall, however, keep separate accounts of receipts from dividends and interest, and of receipts from sales of trust property, and in declaring any dividend in which moneys derived from sales of trust property are included, shall render the holders of trust certificates a statement, showing what amount of the fund distributed was derived from such sales or transfers.

" *Twelfth.* The trustees shall render to the holders of trust certificates, at each annual meeting, a statement of the affairs of the trust. They shall also, when demanded by 67 per cent in value of the holders of trust certificates, furnish a true and perfect inventory and appraisement of all property held in trust, and a statement as full as possible of the financial affairs of the various companies whose stocks are held in trust.

" *Thirteenth.* Said trustees shall exercise supervision, so far as their ownership of stocks enables them to do, over the several corporations or associations whose stock is. held by said trustees. As stockholders of said corporations they shall elect, or endeavor to elect, honest and competent men as directors and officers thereof. They may elect themselves as directors and officers, and shall endeavor to secure such judicious and efficient management of such corporations as shall be most conducive to the interest of holders of trust certificates.

" *Fourteenth.* All the powers of the trustees may be exercised by a majority of their number. They may appoint from their own number an executive committee, and may appoint other committees composed wholly or partly of persons not of the board of trustees, and may delegate to such committees such of their powers as they may deem advisable. A majority of such committees may exercise all the powers conferred upon such committees. \* \* \*

" *Twenty-sixth.* The trust shall continue for twenty-one years from this date, and shall thereafter continue until the termination by a vote of 67 per cent in value of the holders of trust certificates,

at a meeting called for the purpose. After 67 per cent in value of the holders of trust certificates shall vote to terminate the trust, as aforesaid, they may, at the same meeting, or at a subsequent meeting called for that purpose, decide, by a vote of 51 per cent of their number, the mode in which the affairs of the trust shall be wound up, and whether the trust shall be distributed, or whether it shall be sold and the value thereof distributed, or whether part, and if so, what part, shall be divided, and what part shall be sold, and whether such shall be private or public. The trustees who shall continue to hold their offices for that purpose shall wind up the affairs of the trust in the mode agreed upon by the holders of trust certificates as aforesaid."

The omitted articles, fifteenth to the twenty-fifth inclusive, related to the trustees and their mode of selection.

It is alleged that after the execution of this agreement, the shareholders in various other corporations and partnerships, aggregating thirty in number, became parties thereto, and that a majority, if not all, of the shareholders in the various corporations mentioned, transferred and delivered to the trustees all of the stock owned by them, for which trust certificates were issued.

It is also alleged that the corporations and partnerships which became parties to this agreement " produce the largest part of the white lead used and consumed within the State of New York and that part of the United States lying east of the Rocky Mountains, and although the operation of the said business as conducted and carried on by said trustees, their successors, including defendants, under said agreement or scheme has ever been a monopoly and inimical to the best interests of the public at large, yet a continued interruption or cessation of said productions would decrease the supply and correspondingly increase the cost of manufacturing white lead to the said public and cause irreparable loss and injury to the people of this State and of the United States."

It is also alleged that a large amount of property has accumulated under said trust agreement, the extent, nature and value of which is unknown to the plaintiff, but aggregating many thousands of dollars, and for which the trustees have not accounted. The plaintiff alleges that he now is, and since May 22, 1889, has been, the owner

·of 700 shares of the certificates of trust issued by the trustees under said agreement.

It is also alleged that the defendants and their predecessors carried ·on the business organized under the trust agreement under the name ·of the National Lead Trust until December 12, 1891, and since that ·date under the name of the National Lead Company, a corporation ·organized by the defendants and others for that purpose under the statutes of the State of New Jersey, to which corporation, on or ·about that date, the trustees transferred the property received and ·accumulated under the trust agreement.

The plaintiff demands a judgment requiring that the defendants be required to account for the property in their hands; that it be sold, and the avails thereof distributed among the holders of the trust certificates. To this complaint the defendants demurred upon the grounds: (1) That the complaint does not state facts sufficient to ·constitute a cause of action; (2) that it appears upon the face of the complaint that Charles C. Bowen and the National Lead Company are necessary parties to this action. Both grounds of ·demurrer were sustained by the Special Term and a judgment ·ordered dismissing the complaint, with costs.

*Thomas Allison*, for the appellant.

*Elihu Root*, for the respondents.

FOLLETT, J.:

This action is not prosecuted by a former shareholder in any one ·of the constituent corporations of the National Lead Trust to compel a return and reassignment of shares assigned to the trust by the plaintiff, or by his predecessor in interest, nor by a shareholder or the successor of a shareholder of any one of the constituent corporations, to compel the defendants to restore to the corporation the specific property received by the defendants or their predecessors from said corporation, upon the theory that the defendants are mere agents or depositories of said property; but the action is prosecuted in behalf of the holder of trust certificates upon the theory that the so-called agreement is the measure of his rights and of the defendants' liabilities. Whether an action can be maintained by the holder of the certificates to compel the defendants to restore the specific

shares and property which they have received from the corporations and their shareholders, is a question not involved in this case.

The plaintiff alleges in his complaint, and his counsel concedes in his brief, that the trust was organized and carried on for the purpose of monopolizing the business of producing and selling various important products of lead, and that the objects sought to be attained by means of the trust agreement were and are contrary to public policy, and that the agreement is void under the laws of this State. Entering into and carrying on this combination is an indictable misdemeanor (Penal Code; § 168), and was at common law.

The learned counsel for the plaintiff seeks to avoid the class of decisions holding that a court of equity will not determine the respective rights and interests of persons arising out of an unlawful agreement, by citing cases holding that when money has been paid or property delivered upon an unlawful executory contract, an action may be maintained under certain circumstances to annul the contract and recover the money paid or property delivered. This action does not fall within that class of cases for the reason that it is not alleged that the plaintiff ever delivered any property or paid any money to the defendants, or to their predecessors. If it be said that the person to whom plaintiff's certificates were first issued must have done so, the answer is that it is not alleged by what corporation the shares exchanged for plaintiff's certificates were issued, there is no identification of the property, and there are no appropriate allegations in the complaint for the recovery of the original consideration, whatever it was, for these certificates. This action plainly proceeds upon the theory that the plaintiff's rights are to be determined by the trust agreement, and that it is necessary, in order to determine those rights, to have an accounting of all the transactions of the defendants and of their predecessors in carrying out this unlawful agreement. This is precisely what a court of equity will not do. This proposition has been so many times decided by the courts of this State that a citation of many authorities and a discussion of the reason of the rule would be a work of supererogation. ( *Woodworth* v. *Bennett*, 43 N. Y. 273; *Knowlton* v. *Congress & Empire Spring Company*, 57 id. 518; *Arnot* v. *Pittston & Elmira Coal Co.*, 68 id. 558; *Leonard* v. *Poole*, 114 id. 378; *Gray* v. *Oxnard Brothers Co.*, 59 Hun, 387.)

The case last cited was brought by the receiver of the North River Sugar Refining Company to compel an accounting of the sugar trust. It was held in that case that the combination represented by the defendants and entered into between the parties was unlawful, and for that reason the plaintiff was not entitled to the aid of a court of equity to compel the defendants to account. We think that case is not distinguishable in principle from the one at bar, and is controlling upon this court. Both actions are for the same purpose; to recover the amount which the plaintiff may be entitled to on an accounting of the transactions had under an unlawful contract. It is urged that it is a hardship to leave the persons who have entered into this combination without any remedy in the courts. The answer is, that if the courts take an accounting and attempt to do justice as between the wrongdoers, a precedent will be set and judgments declaring such contracts illegal will be without any deterrent effect, because it will be known that if the enterprise is declared to be contrary to law, that, notwithstanding, all of the rights of the participants therein will be protected by the courts.

We think the complaint does not state a cause of action, and on that ground, without considering the question of parties, the judgment should be affirmed, with costs.

O'BRIEN and PARKER, JJ., concurred.

Judgment affirmed, with costs.