## SPRING COMPANY *v.* KNOWLTON.

1. A party to a contract, the making of which, although prohibited by law, is not *malum in se*, may, while it remains executory, rescind it and recover money by him advanced thereon to the other party who had performed no part thereof.

2. The trustees of A., a corporation which was organized under the act of New York of Feb. 17, 1848, for the formation of corporations for manufacturing purposes, and acts amendatory thereof, passed a resolution increasing its capital stock, which was $1,000,000, by the addition of $200,000, allowing each stockholder to take one share of the new stock for every five shares of the original stock which he held, and providing that on his paying in instalments $80 on each share of $100, a certificate as for full-paid stock should be issued to him by the company, and on his failure to pay an instalment of $20 per share on or before a specified date his claim to the new stock should be forfeited, and such forfeited shares divided ratably among the other stockholders who had paid that instalment. A subscription agreement binding the subscribers thereto to take stock and pay $80 per share in instalments as they should be called for by the company, and, on failure to pay any instalment, to submit to the forfeiture of all sums

theretofore paid, was prepared and signed by B., who, being then a trustee of A. and its vice-president, was an active promoter of the scheme for the increase of the stock. He paid but one instalment of twenty per cent on his new stock, and the latter was, by a resolution of the company, declared to be forfeited. The capital stock of the company was afterwards reduced to its original amount, and, to refund the payments made on the new stock withdrawn, bonds were issued. None of them were tendered to or demanded by B. On A.'s refusing to pay him the amount of that instalment, he brought suit therefor. *Held*, that he was entitled to recover.

ERROR to the Circuit Court of the United States for the Northern District of New York.

This suit was brought in 1869 by Dexter A. Knowlton, a citizen of Illinois, against The Congress and Empire Spring Company, in the Supreme Court of the State of New York, to recover the sum of $13,980, with interest from Feb. 20, 1866. In 1876 he died, and the suit was revived and continued by the administrators of his estate. They are citizens of Illinois, and on their application the suit was, March 20, 1877, removed to the Circuit Court of the United States. The parties, by written stipulation, waived a jury. The court tried the case, and found the facts to be substantially as follows: —

The Congress and Empire Spring Company is a corporation organized under the statute of the State of New York of Feb. 17, 1848, authorizing the formation of corporations for manufacturing, mining, mechanical, or chemical purposes, and subsequent acts amendatory thereof. Its capital stock was $1,000,000, divided into ten thousand shares of $100 each, issued in payment of property purchased by the trustees of the corporation for its use.

The mode by which such a corporation might increase its capital stock is prescribed by sects. 21 and 22 of chapter 40 of the laws of 1848.

Sect. 21 prescribes how the notice of a meeting of the stockholders to consider the proposition to increase the capital stock shall be given, and what vote of the stockholders shall be necessary to carry the proposition.

Sect. 22 prescribes how the meeting of the stockholders, called under sect. 21, shall be organized, and declares that if a sufficient number of votes has been given in favor of increasing the amount of capital stock, " a certificate of the proceedings,

showing a compliance with the provisions of this act, the amount of capital actually paid in, . . . the whole amount of debts and liabilities of the company, and the amount to which the capital shall be increased, . . . shall be made out, signed, and verified by the affidavit of the chairman and countersigned by the secretary, and such certificate shall be acknowledged by the chairman and filed, as required by the first section of this act; and when so filed the capital stock of such corporation shall be increased . . . to the amount specified in such certificate, . . . and the company shall be entitled to the priv ileges and provisions, and subject to the liabilities, of this act, as the case may be."

The corporation passed a resolution, Jan. 11, 1866, to increase its capital stock by the addition thereto of $200,000, for the purpose of building a glass factory for the manufacture of bottles and providing a working capital. It also resolved that the books of the company should be opened for subscriptions to the additional stock, and that each stockholder should be allowed to take one share of the new for every five shares he held of the original stock, and that when he had paid $80 on each share the company should issue to him a certificate as for full-paid stock.

At a meeting of the board of trustees of the corporation, held Feb. 8, 1866, a dividend of four per cent on the original stock was declared, payable Feb. 20, and it was resolved that a call of twenty per cent on the new stock should be made, payable on the latter date; that the books of the company should be at once opened for subscriptions to the new stock; that each stockholder should have the privilege of taking one share of the new for every five shares of the old stock held by him, and that on failure of any stockholder to pay, on or before that date, $20 on each share of the new stock taken by him, all his claim to such new stock should be forfeited and the same divided ratably among the stockholders who had paid the instalment of $20 per share.

In pursuance of the resolutions the trustees immediately issued a stock subscription agreement, by which the subscribers stipulated to take the number of shares set opposite their names and to pay for each share $80, in instalments, as called

for by the directors; and upon failure to pay the instalments within sixty days after call, that the money already paid on the stock should be forfeited to the company. By the same agreement the company bound itself to pay interest up to Feb. 1, 1867, on all sums paid on the new stock, and on Feb. 8, 1867, to issue for every share of said new stock on which $80 had been paid a certificate to the holder as for full-paid stock; and it was provided that the holders of such stock should be entitled to vote thereon, and the same should draw dividends and be treated in all respects as full-paid stock.

This agreement was signed by one C. Sheehan, who subscribed for six hundred and ninety shares of the new stock, he being the holder of thirty-four hundred and ninety shares of the old stock.

Thereupon a contract was made between Sheehan and Knowlton, whereby the former agreed to lend the dividend on his old stock to the latter, who agreed to assume the new stock subscribed for by Sheehan, and pay all future calls thereon. Sheehan's dividend on his old stock amounted to $13,988. Knowlton, in consideration of the transfer to him of this dividend, delivered his note to Sheehan for $13,980, dated Feb. 20, 1866, payable in one year, and secured the same by a pledge of one hundred and fifty shares of the stock of the company. He paid the residue, to wit, $8, in cash.

Knowlton paid to the company, March 8, 1866, the call of twenty per cent on the new stock, subscribed by and sold to Sheehan as aforesaid, by the application thereto of Sheehan's dividend on the old stock, amounting to $13,980, for which the company gave Knowlton a receipt.

About December, 1868, Knowlton paid in full his note to Sheehan for $13,980.

Calls and personal demands were made both upon Sheehan and Knowlton more than sixty days before Jan. 25, 1867, for the payment of subsequent instalments on the stock subscribed by Sheehan, and both of them neglected and refused to pay the instalments called for; whereupon the trustees of the company passed a resolution by which they declared that the new stock subscribed by Sheehan and assumed by Knowlton should be and was forfeited.

From August, 1865, to August, 1866, Knowlton was a trustee and vice-president of the company; he advised the increase of the capital stock above mentioned, proposed the resolutions in relation thereto, moved their adoption, drew up and signed the stock subscription agreement, and advised others to sign it.

At a meeting of the stockholders of the company, held Aug 7, 1867, it was resolved that the capital stock of the company should be reduced to the original sum of $1,000,000, and that the trustees be authorized to arrange with the holders of the new stock for retiring the same on such terms and conditions as they should deem for the interest of the company.

On the same day the board of trustees met and passed a resolution, whereby the executive committee of the board was authorized to adjust, on the best terms for the company, the claims of all persons holding receipts for payments on the new stock ordered to be retired.

The executive committee passed a resolution, March 27, 1868, that the company issue five-year coupon bonds sufficient to refund the payments made on the new stock of the company which had been retired.

No tender of these bonds was ever made to Knowlton, nor was any demand made for them by him; but he demanded repayment of the amount paid by him on his new stock, and the company refused to repay it or any part of it.

The majority of the holders of the original stock became subscribers for the new stock, and all of them except Sheehan, Knowlton, and one or two subscribers for small amounts, paid the calls made on them in respect to the new stock. The first call of twenty per cent on the new stock was paid mainly by the dividend on the old stock above mentioned, but about $3,000 were paid in cash. All the stockholders who did not subscribe for new stock were paid their part of the dividend in cash. About $86,500 of said five per cent bonds were issued by the company to retire the new stock.

As a conclusion of law from these facts, the court held that the plaintiffs, as such administrators, were entitled to judgment against the Congress and Empire Spring Company for the sum of $13,980, with interest from Feb. 20, 1866, and

rendered judgment accordingly. The company sued out this writ of error.

It appears by a bill of exceptions that the defendant's counsel requested the court below to decide that the proceedings of the defendant in increasing its capital stock, and forfeiting the amount paid by the plaintiffs' intestate, were in all respects legal and valid. The court refused so to find, and ruled that the plan devised by him and the other trustees of the company was contrary to the provisions of the statute, against public policy, and a fraud upon stockholders not consenting thereto, and the public.

It further appears that the defendant's counsel requested the court to decide that, inasmuch as the intestate devised, counselled, and assisted in passing and adopting all the acts and resolutions for an increase of stock by the company, the plaintiffs were not entitled to recover. The court refused so to decide, and ruled that the intestate had a right to abandon the illegal transaction to which he was a party, and that by declining to pay further calls, and demanding repayment of the payments made before the consummation of the illegal scheme, he did abandon it, and his representatives were entitled to recover. To these refusals and rulings the defendant's counsel excepted.

The errors assigned here are that the court below erred in each of its refusals and rulings, and in deciding that the plaintiffs were entitled to recover.

*Mr. Francis Kernan* and *Mr. Charles S. Lester* for the plaintiff in error.

1. The scheme and contract to increase the stock were in violation of the statute under which the company was organized, and against public policy. *Knowlton* v. *Congress & Empire Spring Co.*, 57 N. Y. 518. That statute expressly requires that all stock shall be paid for at its par value in money, or in such property as is necessary to enable the company to carry on its business. 2 Rev. Stat. N. Y. 507, sect. 49 ; id. 505, sect. 40 ; id. 504, sect. 38 ; id. 505, sect. 41. By this scheme it was stipulated and agreed that scrip for stock should be issued of the nominal or par value of $100 per share on payment of only $80 per share. The first instalment of

$20 of the $80 was intended to be and was paid by applying thereto a dividend of four per cent declared on the old stock. The corporation would thus actually receive only $60 in money per share for the new stock from the subscribers thereof.

2. Knowlton was *particeps criminis* and *in pari delicto* as to the scheme and contract, by which the rights of non-assenting stockholders, creditors, and the public were to be sacrificed. The company could and did become a party thereto only by the action of its trustees and officers. He was a trustee and its vice-president when he originated, actively promoted, and participated in carrying out this scheme. An officer of a corporation who by his advice, votes, and action involves it in such schemes, and who as an individual becomes a party thereto, is at least *in pari delicto* with it. In fact and in law he is the criminal. *Thomas* v. *City of Richmond*, 12 Wall. 349, 356.

3. The plaintiffs were not entitled to recover.

*a.* Where the scheme or contract is *malum in se*, as in this case, and the parties to it are *in pari delicto*, the law refuses to aid either against the other. It leaves them where it finds them. This rule applies as fully where money has been paid and applied in part execution or performance, as where the scheme or contract has been completely executed. Smith, Contracts (3d Am. ed.), 187–191; *Burt* v. *Place*, 6 Cow. (N. Y.) 431; *Nellis* v. *Clarke*, 20 Wend. (N. Y.) 24; s. c. 4 Hill (N. Y.), 424; *Smith* v. *Hubbs*, 10 Me. 71; *Schermerhorn* v. *Talman*, 14 N. Y. 94, 141; *Knowlton* v. *Congress & Empire Spring Co.*, 57 N. Y. 518; *Howson* v. *Hancock*, 8 T. R. 575.

The scheme was, however, actually carried into effect as to the money which the plaintiffs seek to recover. Their intestate had no *locus penitentiæ* as to the dividend of four per cent on the old stock, payable February 20, and amounting exactly to $13,980, the percentage on the new stock, payable at the same time and place. The dividend was then applied to the payment and satisfaction of that percentage which Knowlton was to pay on the new stock.

*b.* Had Knowlton paid or advanced moneys to the company, his right of recovery, if it could be enforced at all, would be

solely by virtue of his original title to them. But as he did not advance them, there is no promise or obligation, expressed or implied, on the part of the company to pay him.

4. The record presents no Federal question. This suit, after the court of last resort in New York had reversed the judgment in favor of Knowlton, and ordered a new trial, was, on his death, revived and continued in the court of original jurisdiction, in the name of his administrators. It was subsequently removed therefrom to the Circuit Court, upon the ground of the citizenship of the parties. The questions involved relate to the statutes under which the company was organized, and to the public policy and law of New York. The Commission of Appeals of that State adjudged and determined, after full argument and consideration, that Knowlton was not entitled to recover. As the decision was made in this suit between the same parties and on the facts now presented, it would be held on a retrial in the courts of New York to be res judicata.

It is submitted that this court, in accordance with its established rule, should follow that decision. *Jefferson Branch Bank* v. *Skelly*, 1 Black, 436; *Elmendorf* v. *Taylor*, 10 Wheat. 152; *Township of Elmwood* v. *Marcy*, 92 U. S. 289; *Fairfield* v. *County of Gallatin*, 100 id. 47; *Scipio* v. *Wright*, 101 id. 665.

*Mr. H. M. Ruggles, contra.*

Mr. Justice Woods, after stating the case, delivered the opinion of the court.

The plaintiff in error claims that the plan adopted by it to increase its capital stock, by which certificates as for full-paid stock were to be issued on the payment of eighty per cent thereof, was against the law and public policy of the State of New York, and was, therefore, void; that Knowlton, having been an active party in devising this scheme, and having paid his money in part execution of it, his legal representatives cannot recover the sum so paid.

It is conceded by the defendants in error that the plan adopted by the company to increase its stock was in violation of the law of New York, and therefore void. It has been so held, in effect, by the Court of Appeals of the State of New

York, in the case of *Knowlton.* v. *Congress & Empire Spring Co.*, 57 N. Y. 518.

We are, then, to consider whether, upon the hypothesis that the plan for the increase of the stock was illegal, there can be a recovery upon the facts of the case as found by the Circuit Court.

We think it clear that there was only a part performance of the illegal contract between the company and Knowlton in reference to the new stock, for which Sheehan subscribed and which he agreed to transfer to Knowlton.

The company, in fact, created no new stock. It only proposed to do so. To increase the stock of the company it was not only necessary that the meeting of the stockholders should be called, as prescribed by the law, and a vote of two-thirds of all the shares of stock should be cast at the meeting in favor of the increase, but that there should be a certificate of the proceedings, showing, among other things, a compliance with the provisions of the law, and the amount of the increase of the stock, signed and verified by the affidavit of the chairman of the meeting at which the increase was voted, and countersigned by the secretary, and such certificate should be acknowledged by the chairman and filed, as required by the first section of the act. And the law declared that " when so filed the capital stock of such corporation shall be increased to the amount specified in such certificate."

It does not appear from the findings of the Circuit Court that any such certificate was ever made or filed. Consequently it does not appear that the steps necessary, under the law, to an increase of the stock were ever taken. Neither does it appear that any scrip or certificates were ever issued to the subscribers to the new stock. So that all that was done amounted only to a proposition by the company, on the one hand, to increase its stock, and an agreement by Knowlton to take certain shares of the new stock when issued, and the payment by him of an instalment of twenty per cent thereon. There was no performance of the contract whatever by the company, and only a part performance by Knowlton.

It is to be observed that the making of the illegal contract was *malum prohibitum* and not *malum in se*. There is no moral

·turpitude in such a contract, nor·is it of itself fraudulent,·how-·ever much it may afford facilities for fraud.

· ꞏ The question presented is, therefore, whether, conceding the contract to be illegal, money paid· by ·one of the parties to· it in part performance can be recovered, the other party not having performed the contract or any part of it, and both parties having abandoned the illegal agreement before it was consummated.

We think the authorities sustain the affirmative of this proposition.

Their result is fairly stated in 2 Comyn on Contracts, 361, as follows : —

"Where money has been paid upon an·illegal contract,·it is a general rule that if the contract be executed and both parties are *in pari delicto*, neither of them can recover from the other the money so paid, but if the contract continues executory and the party paying the money be desirous of rescinding it, he may do so and recover back by action of *indebitatus assumpsit* for money had and received. And this distinction is·taken in the books that where the action is in affirmance of an illegal contract, the object of which is to enforce the performance of an engagement prohibited by law, clearly such an action can in no case be maintained, but where the action proceeds in disaffirmance of such a contract, and instead of endeavoring to enforce it presumes it to be void and seeks to prevent the defendant from retaining the benefit which he derived from an unlawful act, then it is consonant to the spirit and policy of the law that the plaintiff should recover."

Mr. Parsons, in his work on Contracts, vol. ii. p. 746 says : —

"All contracts which· provide that .anything shall be done which is distinctly prohibited by law, or morality, or public policy, are void, so he who advances money in consideration of a· promise or undertaking to do such a thing, may at any time before it is done rescind the contract and prevent the thing from being done and recover back his money."

To the same effect see 2 Addison, Contracts, sect. 1412; Chitty, Contracts, 944 ; 2 Story, Contracts, sect. 617; 2 Greenl. Evid., sect. 111.

The views of the text-writers are sustained by a vast array of authorities, both English and American.

A few will be cited. *Taylor* v. *Bowers* (1 Q. B. D. 291) was an action to recover property assigned for the purpose of defrauding creditors. A verdict was rendered for the plaintiff, with leave to move to enter a verdict for the defendant. A rule was obtained on the ground that the plaintiff could not by the allegation of his own fraud get back the goods from the defendant. The Queen's Bench sustained the verdict, the Chief Justice, Cockburn, delivering the opinion. The defendant then appealed to the Court of Appeals, where the judgment was affirmed. Both courts agreed that an illegal contract partially performed might be repudiated and the money paid upon it recovered.

Lord Justice Mellish, in the Court of Appeals, said: "If the illegal transaction had been carried out, the plaintiff himself, in my judgment, could not afterwards have recovered the goods. But the illegal transaction was not carried out; it came wholly to an end. To hold that the plaintiff is entitled to recover does not carry out the illegal transaction, but the effect is to put everybody in the same situation as they were before the illegal transaction was determined upon, and before the parties took any steps to carry it out. That, I apprehend, is the true distinction in point of law. If money is paid or goods delivered for an illegal purpose, the person who had so paid the money or delivered the goods may recover them back before the illegal purpose is carried out; but if he waits till the illegal purpose is carried out, or if he seeks to enforce the illegal transaction, in neither can he maintain an action; the law will not allow that to be done."

The same rule substantially is laid down in the following English cases: *Lowry* v. *Bourdieu*, 2 Doug. 452; *Tappenden* v. *Randall*, 2 Bos. & Pul. 467; *Hastelow* v. *Jackson*, 8 Barn. & Cress. 221; *Bone* v. *Ekless*, 5 H. & N. 925; *Lacaussade* v. *White*, 7 T. R. 531; *Cotton* v. *Thurland*, 5 id. 405; *Mount* v. *Stokes*, 4 id. 561; *Smith* v. *Bickmore*, 4 Taunt. 474.

In *Morgan* v. *Groff* (4 Barb. (N. Y.) 524), it was held that money paid on an illegal contract, which remains executory,

can be·recovered back in an action founded on a disaffirmance, and on the ground that it is void.

To ·the same effect. are the following cases.: *Utica Insurance Co.* v. *Kip*, 8 Cow. (N. Y.) 20 ;. *Merritt* v. *Millard*, -4 Keyes (N. Y.), 208 ; *White* v. *Franklin Bank*, 22 Pick. (Mass.) 181 ; *Lowell* v. *Boston & Lowell Railroad Corporation*, 23 id. 24.

In *Thomas* v. *City of Richmond* (12 Wall. 349) this court cites with approval the note of Mr. Frere to the case of *Smith* v. *Bromley* (2. Doug. 696), to the effect that a recovery can be had as for money had and received when the illegality consists in the contract itself, and that contract is not executed ;. in such case there is a *locus penitentiæ ;* the *delictum* is incomplete ; ·the contract may be rescinded by either party.

The rule is applied in the great majority of the cases, even: when the parties to the illegal contract ·are *in pari delicto*, the question which of the two parties is the ˙more blamable being often difficult of solution and quite immaterial. We think, therefore, that the facts of this case present no obstacle to a recovery by Knowlton's administrators of the sum paid by him on the stock which had been subscribed for by Sheehan.

The law of New York does not in express terms forbid a . corporation from issuing certificates for ·full-paid stock when the stock has not been fully paid. The illegality of such an issue is deduced from several sections of the law under which the ·Congress and Empire Spring Company was organized, namely, sects. 38, 40, 41, and 49. We think it is fairly inferable from the record that the trustees of the company, one of whom was Knowlton, did not know that the plan adopted by them for the increase of the stock was illegal, and that when they discovered that it was forbidden by the˙law, and before any harm was done or could have been done, the scheme was· abandoned. Under such ectcircumstances, the rule which would prevent the recovery of the money paid to carry on the illegal plan would be a very harsh one, not founded on any law or public·policy.

It is suggested by counsel for the plaintiff in error that the Court of Appeals of the State of New York has in this·identical suit, upon the same state of facts, adjudicated the rights of

the parties, and that this court ought to consider the questions raised in this case as *res judicata*.

. The reply to this. suggestion is. that it nowhere appears in the record that this case was ever before the Court of Appeals, or that it was ever decided by any court except the United States Circuit Court for the Northern District of New York, from which it has been brought to this court on error. We cannot consider facts not brought to our notice by the record.

*Judgment affirmed.*

MR. JUSTICE HARLAN dissenting.

This action was commenced in the Supreme Court of the State of New York. •The present transcript is imperfect in that it does not contain all the proceedings in the courts of the State up to the removal of the case into the Circuit Court of the United States. It is, however, conceded, in the briefs of counsel, that Knowlton recovered in the Supreme Court a judgment which, upon a writ of error from the Commission of Appeals, was reversed upon the grounds stated in *Knowlton v. Congress & Empire Spring Co.*, 57 N. Y. 518. The learned district judge who tried the case commences his opinion, which is incorporated in the transcript, with the statement that "this case comes here by removal from the State court, after a decision adverse to the plaintiff by the Commission of Appeals, reversing the judgment of the Supreme Court in favor of plaintiff, and ordering a new trial. 57 N. Y. 518." He then proceeds to determine it upon principles of law different from those announced in that decision. Had it been again tried in the Supreme Court, judgment must have been rendered against these defendants in error, because the reversal was upon such grounds as precluded any recovery whatever by them. That decision should, in my opinion, have been accepted as the law of this case, although the proceedings in the Commission of Appeals are not set forth in the transcript. The reported case shows, beyond question, that it is the identical case now before us; at any rate, that it was between these parties and involved the same issues. We know that the adjudication of that court was long prior to the removal of this case, and

that the questions arising upon this record have been once determined by a court of competent jurisdiction in a suit between the same parties touching the subject-matter now in controversy. All this plainly appears by that decision, the legal effect of which, the defendants in error should not be permitted to escape by removing the case into the Circuit Court.

Upon these grounds, and without expressing my own views upon the propositions of law discussed in the opinion of the court, I dissent from the judgment just rendered.