## New Castle Northern Ry. Co. *v.* Simpson.

*(Circuit Court, W. D. Pennsylvania.  August 13, 1884.)*

1. RAILROAD COMPANY—CONTRACT ULTRA VIRES—RESCISSION—PART PERFORMANCE.

   A court of equity, upon a bill filed by a corporation, will rescind a contract still executory into which it has entered, where the same is *ultra vires* and against public policy, although all the stockholders may have either expressly assented thereto or acquiesced for a season therein, and in its partial execution by the other party.

2. SAME—CONSTITUTION OF PENNSYLVANIA—CONTRACT TO CONSTRUCT RAILROAD.

   The constitution of the state of Pennsylvania provides that "no corporation shall issue stocks or bonds except for money, labor done, or money or property actually received; and all fictitious increase of stock or indebtedness shall be void." An incorporated railroad company of that state entered into a construction contract whereby the contractor agreed to furnish all the materials and do all the work necessary to construct the company's road, at an expenditure, however, not exceeding $200,000; and in consideration thereof the company agreed to issue to the contractor $300,000 of its capital stock as fully paid up, and $300,000 of its first mortgage bonds. The materials could be furnished and the road built for $180,000 cash. *Held,* that the contract contravened the constitutional provision, and was *ultra vires* and void.

3. SAME—PENNSYLVANIA STATUTES OF APRIL 4, 1868, AND APRIL 18, 1874.

   The act of assembly of April 4, 1868, limits the amount of a railroad company's construction mortgage bonds to the amount of the capital stock subscribed, and authorizes the issue of such bonds in amounts not exceeding double the amount actually paid up of the capital stock subscribed; and the act of April 18, 1874, forbids any corporation to increase the amount of its indebtedness beyond the amount of its capital stock subscribed, until the amount of its capital stock subscribed shall be fully paid in. *Held,* that the performance by the railroad company of its said contract involved a violation of these statutory provisions, it appearing that no part of its subscribed capital stock, which was $250,000, had been paid in.

4. SAME—PART PERFORMANCE BY CONTRACTOR—COMPENSATION.

   Before the bill was filed the contractor had entered upon the work of construction, and he has expended upwards of $40,000. *Held* that, while the contract must be rescinded as one which the corporation had no lawful power to make or perform, yet the rescission should be upon terms securing to the contractor just compensation, his conduct being free from actual bad faith

In Equity.

*R. B. McCombs, Frank Whitesell,* and *J. B. Brawley,* for complainant.

*J. H. McCreary, D. B. Kurtz,* and *Marshall Brown,* for respondent.

ACHESON, J.  The purpose of this bill, which was filed on December 15, 1883, in the court of common pleas of Lawrence county, is the rescission of a construction contract between the plaintiff (the New Castle Northern Railway Company) and the defendant (Thomas P. Simpson) on the ground that it was beyond the powers of the plaintiff company to enter into such contract or fulfill its terms, it being against public policy and in violation of the state constitution, and its execution involving also an infraction of certain statutory enactments.  The plaintiff company was incorporated under the laws of Pennsylvania on the first day of February, 1883, with power to construct a railroad in Lawrence and Mercer counties, the articles of association fixing the capital stock at $250,000, in shares of $50 each.  This capital stock was all subscribed for by nine individuals, but it has never been called in, nor has any part thereof been paid. On May 25, 1883, at an irregularly called stockholders' meeting,—30 days' newspaper notice only having been given, instead of 60 days' notice, as required by law,—it was resolved that the capital stock be "increased to $30,000 per mile."

On the fifth day of October, 1883, the plaintiff and defendant entered into a written contract whereby the defendant agreed to furnish all the materials and do all the work necessary to construct the railway of said company from the junction with the Pittsburgh & Lake Erie Railroad, in the city of New Castle, in Lawrence county, to the town of Middlesex, in Mercer county, Pennsylvania, a distance of about 16 miles, with sidings and branches 2 miles in length; and in consideration thereof the plaintiff agreed to pay and deliver to the order of the defendant, from time to time, as required by him, its capital stock and first mortgage bonds at the rate of $30,000 in full-paid capital stock and $30,000 at par of first mortgage bonds, for each and every mile of track constructed under the agreement; the contract, however, expressly providing that the sum which the defendant was to expend was not to exceed $200,000.

According to the terms of the contract, its fulfillment would require the delivery by the company to the defendant of $540,000 of paid-up capital stock, and $540,000 of first mortgage bonds; but by a separate instrument of writing, bearing the same date, the defendant assigned $480,000 of these securities, viz., $240,000 of bonds and $240,000 of stock, to two of the directors of the company, in trust, to be used in paying for rights of way, etc.  The evidence warrants the conclusion that the *bona fide* cash expenditures to be covered by this trust would be greatly less than the nominal value of the assigned securities, and that one main purpose to be subserved by the trust arrangement was the securing to certain directors and promoters of the company large profits out of the right of way, which, for the most part, was located upon the bed of an abandoned canal which these

parties had purchased for the company at a low price. It is, however, due to the defendant to say that he had no personal interest in these proposed illegitimate gains. A construction contract of the same general character had previously existed with one W. W. Reed, but, by agreement, it was canceled on or about October 5, 1883, Simpson paying $5,347.43 for work, etc., done under it.

On October 23, 1883, in order to obviate objections raised by some of the directors of the company, the defendant executed an instrument whereby he agreed to certain modifications of his contract, not material, however, to the decision of the present questions before the court. The defendant began work under the contract shortly after its date, and proceeded therewith until about January 14, 1884, when he was stopped by a preliminary injunction issued by the said court of common pleas. The cause having been subsequently removed by the defendant into this court, the injunction was here so modified, by an order made March 12, 1884, "as to leave the defendant, Thomas P. Simpson, at full liberty to proceed with the work of construction under said contract." The defendant, however, never resumed operations, and the work of construction has been at a stand-still. The defendant testifies that his cash expenditures have been $42,229.69, but this includes ties ordered, but, it would seem, not delivered.

The evidence shows, and, indeed, it is one of the admitted facts in the case, that the railroad can be built under the contract of October 5, 1883, and its specifications, for $180,000 cash.

Upon the proofs two questions arise for solution, viz.: *First,* whether the construction contract on the part of the railway company is *ultra vires,* as claimed; and, if so, then, *second,* whether the case is one for the interposition of a court of equity to rescind it, at the instance of the company.

1. It is certainly true, as the defendant's counsel urge, that railroad corporations have frequently contracted to pay for the construction of their roads in stock and bonds in amount, at the par value thereof, much in excess of the actual amount it would cost or was worth; and, undeniably, such contracts have received judicial sanction. *Van Cott* v. *Van Brunt,* 82 N. Y. 535, 539; Ang. & A. Corp. § 590a. But the contract now before the court must be tested by a provision of the constitution of the state of Pennsylvania, in the words following:

"No corporation shall issue stocks or bonds except for money, labor done, or money or property actually received; and all fictitious increase of stock or indebtedness shall be void. The stock and indebtedness of corporations shall not be increased except in pursuance of general law, nor without the consent of the persons holding the larger amount in value of the stock first obtained, at a meeting to be held after sixty days' notice given in pursuance of law." Article 16, § 7.

In view of this constitutional inhibition, can the construction contract of October 5, 1883, stand? The scope of this section has not

been judicially determined, nor even considered hitherto, so far as I am advised. Therefore, of its purview it becomes me to speak with caution. The intention would seem to be to interdict every issue by a corporation of stocks or bonds which do not in good faith represent a. consideration in labor done, or property or money received, substantially corresponding in value with the face amount of such issue. But, upon a much less stringent construction, is it possible to sustain the issue of stock and bonds contemplated by the agreement under consideration? By its express terms, as we have seen, the defendant is not to expend more than $200,000, and it is conceded that his entire expenditures for materials and in work would not, in fact, exceed $180,000; yet, therefor, the corporation is to issue to him its full paid-up capital stock to the amount of $300,000, and its first mortgage bonds to the like amount of $300,000. For every dollar's worth of labor done for the corporation, or property received by it, or of money expended in its behalf, the defendant is to receive more than threefold in the stock and bonds of the company. A door is thus to be opened for throwing upon the market, to the beguilement of confiding people, corporation securities apparently representing $600,000 of real value, but having actually behind them $180,000 of value only. The above-quoted section of the new constitution of the state has strangely miscarried, if such an issue of "watered stock" and unsubstantial bonds can be emitted. If the transaction in hand is not within its prohibition, it would be difficult to conceive anything that would be. If the proposed issue of stock and bonds beyond the sum of $180,000 would not be "fictitious," it is hard to divine the meaning which the framers of the constitution attached to that word.

Again, the authority to issue the proposed mortgage bonds is to be deduced from section 8 of the general railroad law of April 4, 1868. 2 Purd. 1213, pl. 8. But that section limits the indebtedness so to be created to the amount of capital stock subscribed, and authorizes "the issue of the bonds of the company therefor, in such amounts as shall not exceed double the amount actually paid up of the capital stock subscribed." And by the proviso to section 1 of the act of April 18, 1874, (P. L. 61,) regulating the manner of increasing the capital stock and indebtedness of corporations, it is enacted "that no corporation shall increase the amount of its indebtedness beyond the amount of its capital stock subscribed, until the amount of its capital stock subscribed shall be fully paid in." Now this construction contract entirely disregards these wholesome statutory restrictions. The original capital stock of the plaintiff company (all subscribed for in the articles of association) was $250,000,—a sum far more than is necessary to accomplish all that the defendant has bound himself to do; yet not one dollar thereof has been called or paid in. Upon the uncontradicted proofs it is perfectly plain that the intention of all parties here was that this enterprise should be conducted without any

cash capital, and altogether upon the basis of an issue of corporation stock and bonds amounting to $1,080,000,—a sum enormously in excess of the requirements of the railway company were its affairs honestly managed in obedience to the constitution and laws of the state. To make or perform such a contract as the one in question was beyond the lawful powers of this corporation, and the defendant was bound to know its legal incapacity.

2. There can be no doubt that a court of equity may entertain a bill to avoid a contract of a corporation which it had no power to make. *Auburn Academy* v. *Strong,* Hopk. (N. Y. Ch.) 278. And constructive fraud involving a breach of trust, or an abandonment of duty, or a violation of public policy, is a recognized ground for equitable interposition for the cancellation of agreements. 1 Story, Eq. Jur. § 694. Where there is fraud against public policy, a court of equity will rescind, notwithstanding the party plaintiff has participated therein, if public policy would be defeated by allowing the instrument to stand. Id. §§ 695, 695a. And so long as the contract continues executory, the maxim "*in pari delicto*" does not apply at all. Ad. Eq. *175; *Spring Co.* v. *Knowlton,* 103 U. S. 49. These principles open the way for equitable intervention here, and nothing appears to induce a denial of the relief sought. It is, indeed, inferable from the evidence that all the stockholders of the plaintiff company either expressly assented to the contract of October 5, 1883, or acquiesced for a season therein. But it is shown in *Thomas* v. *Railroad Co.* 101 U. S. 71, 33, that a contract not within the scope of the powers conferred on a corporation, and against public policy, cannot be made valid by the assent of every one of the shareholders. Nor is it a sufficient reason for refusing to interfere, that some of the directors, who were parties to the indefensible scheme for private speculation heretofore referred to, were active in promoting this suit, and in its prosecution. Even for them there is a *locus penitentiæ*. *Spring Co.* v. *Knowlton, supra.* They, however, are not the complainants. The suit is by the corporation, which owes a paramount duty to the public. Its former course was inexcusable, indeed; but, having retraced its false steps, it is now in the right pathway. Having entered into a contract forbidden by public policy, (as was said in *Thomas* v. *Railroad Co., supra,*) "it was the duty of the company to rescind or abandon it at the earliest moment." This it has done; but to the end that it may the better discharge its obligation to the public, it needs the aid of a court of equity to set aside the improvident and illegal contract with which it is embarrassed. The railroad is unfinished. The work of construction has ceased. Although free to proceed, the defendant for many months has done nothing. His inaction is, doubtless, wise; for, were this bill dismissed, he could not expect a court of equity to decree the specific performance of his construction contract; and if at law he could recover at all for future work, it would be as upon a *quantum meruit* only. It is better for the defendant that

there should be a decree of rescission, for it may be coupled with equitable terms securing him a just allowance. And this would be right; for, notwithstanding the charge of positive bad faith made by the plaintiff's counsel at the hearing against the defendant, nothing has been shown to deprive him of payment at a fair rate for all materials furnished and work done by him under the contract.

Such an allowance will be made, and to ascertain the amount thereof it will be necessary to send the case to a master.

Let a decree be drawn in accordance with the foregoing views.