ST. LOUIS, V. & T. H. R. Co. *v.* TERRE HAUTE & I. R. Co.

*(Circuit Court, S. D. Illinois.   January 11, 1888.)*

1. RAILROAD COMPANIES — LEASE OF ROAD — CONSENT OF STOCKHOLDERS —
WAIVER.
    A railway company leased its road, and 19 years afterwards brought suit to
    set aside the lease because it was made without the stockholders' written con-
    sent, as required by law.   *Held*, that the requirement of consent was a per-
    sonal benefit which the stockholders waived by long acquiescence.
2. CONTRACTS—VALIDITY—RATIFICATION.
    The plaintiff and defendant entered into a contract of doubtful validity.
    By subsequent enactment it became lawful to make such contracts.   *Held*,
    that recognition by the parties for 19 years thereafter was a ratification of
    the contract.
3. EQUITY—LACHES—ANNULMENT OF LEASE.
    The plaintiff leased its road, and 19 years afterwards brought suit to declare
    the lease void.   *Held*, that the plaintiff was guilty of such laches as will bar
    relief in equity.
4. SAME—PLEADING—MULTIFARIOUSNESS.
    A bill in equity praying that a lease be declared void, and for an accounting
    of the money due by the terms of the lease, should it be declared valid, is
    multifarious.

In Equity.   On demurrer to bill.

*Trumbull, Robbins & Trumbull, John M. Butler,* and *J. T. Brooks,* for
complainant.

*George Hoadly, William M. Ramsey, Greene & Humphrey,* and *John G.
Williams,* for defendant.

Before GRESHAM, C. J., and ALLEN, D. J.

GRESHAM, J.   The complainant, the St. Louis, Vandalia & Terre
Haute Railroad Company was chartered by an act of the general assem-
bly of the state of Illinois, approved February 10, 1865, to construct
and operate a railroad from the bank of the Mississippi river, opposite
East St. Louis, to the eastern boundary of the state of Illinois, at a
point most convenient for extending the same to the city of Terre Haute,
in the state of Indiana; and this charter was amended by an act ap-
proved February 8, 1867.   The defendant was chartered by an act of
the general assembly of the state of Indiana, passed January 26, 1847,
under the name of the Terre Haute & Richmond Railroad Company,
with power to construct and operate a railroad from a point on the west-
ern line of the state of Indiana, easterly through Terre Haute to Rich-
mond, in the same state; and by an act passed March 6, 1865, the name
of the defendant was changed to the name it now bears.

The bill avers that the complainant was not authorized by its charter
to part with the possession of its property and franchises indefinitely, or
for a fixed period of time, by a lease or other contract; and that the de-
fendant was not authorized by its charter to acquire, by like means, the
possession, management, or control of any railroad located beyond the
limits of the state of Indiana, for an indefinite or fixed period; that in

order to secure money to construct and equip its road, the complainant on April 6, 1867, executed a mortgage or deed of trust, dated January 1, 1867, conveying to trustees all its railway and equipment to secure the payment of bonds aggregating $1,900,000, drawing interest at the rate of 7 per cent. per annum, in which instrument it was provided that, beginning on July 1, 1872, there should be set apart and paid to a commissioner out of the earnings of the railroad, $20,000 annually, as a sinking fund for the redemption of these bonds; that on March 13, 1868, the complainant executed its second mortgage, or deed of trust, to secure the payment of an additional issue of bonds aggregating $2,600,000, drawing 7 per cent. interest; that these two issues of bonds were all sold, and the proceeds thereof applied to the construction and equipment of the railroad; that they are all outstanding and unpaid, and that no sinking fund has been created, as provided in the first mortgage; that on the tenth of February, 1868, the complainant executed a pretended lease of its railroad, property, and franchises to the defendant for the period of 999 years, which is set out in the bill as follows:

"Whereas, a contract for the construction and equipment of the St. Louis, Vandalia & Terre Haute Railroad, belonging to a corporation of the state of Illinois, has been entered into this day, by which arrangements have been made to complete and equip said road between East St. Louis and the state line of Indiana, in the manner set forth in said contract; and whereas, the Terre Haute & Indianapolis Railroad Company, a corporation of the state of Indiana, has proposed to construct, without delay, a first-class railroad, being an extension of their present road from Terre Haute to the state line of Indiana, upon such location as will connect properly and directly with the St. Louis, Vandalia & Terre Haute Railroad at the state line of Illinois; and whereas, it is desirable that the said lines, when connected, should be operated by the Terre Haute & Indianapolis Railroad Company as one road between Indianapolis and St. Louis, and the said Terre Haute & Indianapolis Railroad Company having proposed to *lease* and operate the said St. Louis, Vandalia & Terre Haute Railroad for a period of nine hundred and ninety-nine (999) years:

"It is therefore agreed—*First.* That upon completion of the road between East St. Louis and the state line of Indiana, the Terre Haute & Indianapolis Railroad Company shall take charge of and operate the same with its equipment, for a period of nine hundred and ninety-nine (999) years, for which they shall be allowed sixty-five (65) per cent. of the gross receipts from all traffic moved over the line or business done thereon, and from the property of the company, as a consideration for working and maintenance expenses, the remaining thirty-five (35) per cent. to be appropriated as follows: (1) To the payment of interest on the first and second mortgage bonds of the St. Louis, Vandalia & Terre Haute Railroad Company, according to their legal priority. (2) All the surplus of said thirty-five (35) per cent. to be paid over to the St. Louis, Vandalia & Terre Haute Railroad Company (semi-annually) to be disposed of by it for the benefit of its stockholders. If the thirty-five (35) per cent. should, from any cause, not be sufficient in amount to protect the interest on mortgage bonds and sinking funds therefor, as they mature from time to time, together with the payment of taxes and proper cost of maintaining organization, so that the rights of stockholders may be preserved, then, and in that event, the lessee shall advance for the company whatever amounts may be needed to be accounted for under the yearly averages of this lease during the contract.

"It is further agreed, that the Terre Haute & Indianapolis Railroad Company, as lessee, shall enjoy all the rights, powers, and privileges of the St. Louis, Vandalia & Terre Haute Railroad Company, so far as the same may be needful to maintain and operate said railroad; and to impose and collect tolls and rates for transportation, and do all other acts and things as fully and effectually as the said St. Louis, Vandalia & Terre Haute Railroad Company could do if operating said line; it being always understood and agreed that the gross proceeds from through or joint traffic or business shall be divided on the *pro rata* basis per mile for distances moved on the road of each party."

The bill further avers that on January 12, 1869, and after the bonds had been sold as previously stated, the board of directors of the complainant adopted a resolution declaring that the defendant should be allowed 70 per cent. out of the gross receipts, instead of 65 per cent., for operating the road, and that by agreement between the parties the lease should be modified only to that extent; that by a statute of the state of Illinois, in force at the time the pretended lease was executed, no railroad company in the state of Illinois was allowed to lease its railroad and other property and franchises to any foreign railroad company, without having first obtained the written consent of all stockholders residing in that state; and that the pretended lease was executed without the written consent of 59 stockholders who then resided in Illinois; that on the completion of the construction and equipment of the road, on July 1, 1870, the defendant took possession and control of the same, and from that time to the present has operated the entire property under the franchises granted to the complainant, and has received, in tolls and other earnings, more than $21,600,000; that the pretended lease is void, because neither the plaintiff nor the defendant was authorized by the states which created them to enter into such a contract; that the defendant is liable as trustee to account to the complainant for all the property embraced in the pretended lease, together with all receipts and profits derived from the management and operation thereof, and to restore immediately to the complainant the full control and possession of all its property, and its earnings, after deducting reasonable disbursements made by the defendant in the care, management, and maintenance of the same; that the defendant has refused to deliver to the complainant, on demand, its property, and the earnings derived therefrom; that during the entire period the defendant has been in possession of the railroad, it has failed to pay over to the complainant, according to the terms of the lease, the latter's full share of the gross receipts; that there is now due the complainant from this source, after payment of interest which has accrued upon the mortgage bonds, more than $500,000; that by reason of the defendant's failure to make such payments as they became due the complainant has been unable to create any sinking fund, as required by the terms of the first mortgage; that the complainant entered into the contract supposing it had lawful authority to do so, but it has been recently advised by its counsel that it had no such power, and that the lease is null and void, and that it is its duty to repudiate the same, and resume possession of its property and franchises; that the complainant is liable to have its

charter and corporate rights forfeited by the state of Illinois; that by proper management the income of its property can be largely increased; that the present income is more than sufficient to pay the interest on its bonded indebtedness, and create a sinking fund as required by the first mortgage; and that the first mortgage is liable to be foreclosed at any time on account of the failure to create such sinking fund.

The bill also further avers that whether the lease be valid or void, an accounting is necessary to determine the amount of money received from the defendant in the operation of the road, which will require the examination of long and complicated accounts, covering a period of 17 years; that the pretended lease is a cloud upon the complainant's title to its property; that the defendant is daily withdrawing from the jurisdiction of this court large sums of money accruing from the operation of the road, which it will continue to do unless restrained by this court, or unless a receiver be appointed *pendente lite.*

The prayer is that the lease be declared null and void; that the defendant be required to deliver to the complainant the possession of all property which it now holds under the lease; that the defendant be perpetually enjoined from disturbing the complainant in such possession; that an account be taken of all money received by the defendant, or which it might have received by proper management of the property, and that the defendant be required to pay to the complainant the earnings so found to have been received by the defendant, as well as the fair value of any property not accounted for, less reasonable disbursements and expenses as already stated; and that if the lease shall be held valid, an accounting be taken of the amount due under its terms from the defendant; and that the complainant have a decree for the amount so found due.

The defendant demurs to the bill (1) because it discloses no equity; (2) because it is multifarious and contradictory; and (3) because the complainant has a complete remedy at law.   Section 1 of an act of the Illinois legislature, approved February 12, 1855, reads:

"Section 1. That all railroad companies incorporated or organized under, or which may be incorporated or organized under the authority of, the laws of this state, shall have power to make such contracts and arrangements with each other, and with corporations of other states for leasing or running their roads, or any part thereof, and also to contract for and hold in fee-simple, or otherwise, lands or buildings in this or other states, for depot purposes, and also to purchase and hold such personal property as shall be necessary and convenient to carry into effect the object of this act."

Section 1 of an act of the general assembly of the same state, approved February 16, 1865, reads:

"Section 1. That it shall not be lawful for any railroad company of Illinois, or for the directors of any railroad company of Illinois, to consolidate their road with any railroad out of the state of Illinois, or to lease their road to any railroad company out of the state of Illinois, or to lease any railroad company out of the state of Illinois, without having first obtained the written consent of all the stockholders of said road residing in the state of Illinois, and any contract for such consolidation or lease which may be made without having

first obtained said written consent, signed by the resident stockholders in Illinois, shall be null and void."

In 1874 the last-named statute was repealed, and the act of 1855 was re-enacted, and on the eighth of February, 1867, an act was passed amending the complainant's charter, section 13 of which reads:

"Said company shall have power to consolidate and connect its railroad with any other continuous line of railroad now constructed, or which may be hereafter constructed, either in this state or in the state of Indiana, upon such terms as may be agreed upon between the companies so connecting or uniting; and for that purpose, full power is given to such company to make and execute such contract with any other company as will secure the object of said consolidation or connection."

On the twenty-third of February, 1853, the legislature of Indiana passed an act, (Rev. St. §§ 3971, 3972,) the first and second sections of which read:

"Section 1. Any railroad company heretofore organized under the general or special laws of this state shall have the power to intersect, join, and unite its railroad with any other railroad constructed, or in progress of construction, in this state or any adjoining state, at such point on the state line, or at any other point as may be mutually agreed upon by said companies; and such railroad companies are authorized to merge and consolidate the stock of the respective companies, making one joint stock company of the two railroads thus connected, upon such terms as may be by them mutually agreed upon in accordance with the laws of the adjoining state, with whose road or roads connections are thus formed, provided their charters authorize said railroad to go to the state line, or to such point of intersection.

"Sec. 2. Any railroad company heretofore organized, or which may hereafter be organized, under the general or special laws of this state, for the purpose of constructing a railroad from any point within this state, to the boundary line thereof, is hereby empowered to extend said railroad into or through any other state or states, under such regulations as may be prescribed by the laws of such state or states, into or through which said road may be so extended; and the rights and privileges of said company over said extension in the construction and use of said railroad for the benefit of such company, and in controlling and applying the assets of such company, shall be the same as if its railroad had been constructed wholly within this state."

It is claimed that the Illinois statute of 1865 limited the power previously conferred upon railroad corporations of that state to consolidate or enter into leases with railroad companies outside of the state; and that the contract involved in this suit is void because the Illinois company made it without the written consent of the resident stockholders. The act of 1865 was repealed in 1874, when the act of 1855 was re-enacted, and from the last-named date until this suit was brought, 13 years, the defendant continued to hold and operate the road in Illinois under the contract with the complainant's consent. This recognition and performance, since the re-enactment of the act of 1855, was enough of itself to conclude the complainant. If after the repeal of the act of 1865 the contract had been re-executed, its validity under the laws of Illinois could not be questioned, and what was done subsequent to 1874 was referable to the contract and the act of 1855. A new agreement made after 1874 would have been no less binding, and even if the contract was invalid un-

der the act of 1865, it is now too late for the complainant to say that it was made without authority, and in violation of that act. But without reference to the act of 1855 and its re-enactment, and the subsequent action of the two companies, we hold that the written consent of all the stockholders residing in Illinois to a lease of an Illinois railroad to a company out of the state, was a provision inserted in the act of 1865 for the personal benefit of such stockholders, and one which they could, and in this case did, waive by long acquiescence. The silence of the stockholders for almost 20 years was equivalent to their written consent. Any resident stockholder might have enjoined the execution and performance of the contract by a suit brought in due time, but no such suit could be maintained after an acquiescence for the period stated, and no one but a stockholder could object to the contract on that ground. *Thomas* v. *Railway Co.*, 104 Ill. 462; *Taylor* v. *Railroad Co.*, 4 Woods, 575; *Beecher* v. *Mill Co.*, 45 Mich. 103, 7 N. W. Rep. 695.

The relief sought by the complainant is inequitable, and against the rules which govern courts of conscience; and if the contract could not be sustained under the Illinois laws on any other ground, we would feel authorized to hold that the word "void" in the act of 1865 meant "voidable." Prior to 1865, railroad companies in Illinois were expressly authorized to lease their roads to companies out of the state; and the provision in the act of the last-named date, which required the written consent of resident stockholders to give validity to such contracts, is no evidence of a change in the previous policy of the state. That the policy of Illinois favored such action by its own railroad corporations, abundantly appears from the public statutes, and the decision of its courts. The act of 1865 is relied on as establishing a contrary policy. We do not think it does; but if it did, that act was repealed in 1874.

If the defendant was not expressly authorized by the Indiana statutes to make the contract, it was not in terms prohibited from doing so; and it follows that if the contract is void, it is so on the sole ground that its execution by the defendant was impliedly prohibited by the laws of its domicile. We hazard nothing in saying that a judgment of an Indiana court forfeiting the defendant's franchises for no other reason than the making and performing of this contract would startle the bar of that state.

In *Branch* v. *Jesup,* 106 U. S. 468, 1 Sup. Ct. Rep. 495, the supreme court of the United States held that a grant of power to a railroad company to consolidate included the lesser power to sell its road, or buy another road; and that the power to construct a railroad included the power to purchase a railroad, and pay for the same by an issue of its own stock. The power to consolidate was expressly given to the defendant by the first section of the Indiana act of 1853, and by the thirteenth section of the Illinois act of 1847 the same power was expressly granted to the complainant, and treating the contract either as a sale or lease, we are unable to see why it was not valid under the ruling in the case just cited. *Manufacturing Co.* v. *Bank,* 119 U. S. 191, 7 Sup. Ct. Rep. 187; *Branch* v. *Atlantic, etc.,* 3 Woods, 481; *Darling* v. *Rogers,* 22 Wend. 486.

It is urged with earnestness by counsel for the defendant that the second section of the act of 1853 expressly authorized that company to extend its road from the state line into or through the state of Illinois, under such regulations as the latter state might prescribe; and that regulations for such extension were prescribed by the Illinois statutes; and further that the two roads, meeting as they did at the line dividing the two states, the defendant was expressly authorized by the Indiana statute to make the contract with the complainant for the use of its road in Illinois. But for the decision of the supreme court of the United States in *Railroad Co.* v. *Railroad Co.*, 118 U. S. 630, 7 Sup. Ct. Rep. 24, we might yield to the force of this argument. That was a suit brought by an Illinois railroad company against an Indiana railroad company, and corporations of other states, to enforce a lease, and for other relief. The Illinois corporation owned a line of railroad extending from the Mississippi river opposite St. Louis to Terre Haute, Indiana, 12 miles of the road being in the latter state. By the terms of the lease the Indiana company acquired the right to hold, maintain, and operate for the Illinois company its line of road, equipment, and franchises for a term of 99 years, paying therefor a prescribed annual rental. The supreme court of the United States held that the lessor, the Illinois company, was authorized by the Illinois act of 1855 to make the lease; but that the Indiana act of 1853 did not authorize the Indiana company to accept the lease, and it could not, therefore, be enforced against the latter company; that the powers of corporations organized under legislative authority were such, and such only, as were expressly conferred or plainly implied; that the enumeration of powers granted implied the exclusion of others; and that unless expressly authorized by its charter, or aided by some other legislative action, a railroad company could not, by lease or any other contract, turn over to another company for a long period of time its road and all its appurtenances, the use of its franchises, and the exercise of its powers, nor could any other railroad company without similar authority make a contract to receive and operate such road, its franchises, and property, and that such a contract was not among the ordinary powers of a railroad company, and was not to be presumed from the ordinary grant of powers in a railroad charter.

If the Indiana act of 1853 did not authorize the Indiana corporation to accept the lease which was involved in that suit, it did not authorize the defendant to bind itself by the instrument now in suit, whether it be a lease "or any other contract," and although *Branch* v. *Jesup* is not expressly overruled by the case last referred to, and we are not convinced that it was intended to be overruled, we nevertheless feel obliged to hold that the defendant had no power, under the Indiana act to make the contract involved in this suit, and that it is void as to the defendant for that reason alone. It does not appear from the bill that by making the contract and operating the road in Illinois, the defendant had deprived itself of ability to successfully operate its own road in Indiana, or that it had neglected any duty that it owed to the latter state, or its own stockholders. On the contrary, for anything appearing in the bill,

the defendant has been benefited by the contract, and its performance.

It being settled, then, that the laws of Illinois authorized both corporations to execute the contract, and perform it in that state; and that the laws of Indiana conferred no such authority on the defendant, and that the contract is therefore void as to the latter, can this suit be maintained? The invalidity of the contract is not relied on here as a defense to a suit for its enforcement, as was the case in *Railroad Co.* v. *Railroad Co.*, and *Thomas* v. *Railroad Co.*, 101 U. S. 71; and, indeed, in most, if not all, of the cases cited in support of the bill.

It is urged that if the laws of Illinois authorized the contract, and the laws of Indiana did not, it is void as to both companies because they both acted illegally in making it. Is a railroad company entitled to affirmative relief in a court of equity against its own illegal acts, and that, too, without regard to laches? It is well settled that a corporation may plead as a defense to a suit upon a contract that it is against public policy or good morals, or that it is expressly prohibited by law, or impliedly prohibited because not authorized by its charter, or any other legislative authority. But it does not follow that because such defenses are sustained, that a court of equity will in all cases annul an illegal contract at the suit of a party to it. Stockholders who act with reasonable promptness may enjoin the execution and performance of illegal agreements and acts, but it is believed that few, if any, well-considered cases can be found in which affirmative relief has been granted to one of the wrong-doers. In *Spring Co.* v. *Knowlton*, 103 U. S. 49, it was held that a party to an executory contract not *malum in se*, but prohibited by law, might recover back money which he had advanced under it to the other party who had performed no part of the agreement. Assuming that the contract now under consideration is executory, it cannot be said it has not been performed in part by the defendant. It is not claimed that interest on the complainant's outstanding bonds is due and unpaid, or that the defendant is insolvent. No complaint is made by the defendant or any stockholder of either corporation against the contract. No such complaint is made by the state of Illinois or the state of Indiana, nor is it seriously believed that either state ever will make such complaint; and yet we are told that because the contract is executory and continuing, and was made by both companies, certainly by the defendant, without legislative authority, the court must annul it under the rulings in *Railroad Co.* v. *Railroad Co.* We do not think that the supreme court of the United States by that case meant to establish principles for the guidance of courts of equity at variance with the current of its decisions.

So far as this suit seeks to annul the contract, it might have been brought 18 years ago, for the agreement was invalid from the beginning; and if it be true that such a suit may be brought at any time before the contract expires by its own terms, laches being no obstacle to relief, the complainant might have delayed for an hundred years more without injury or prejudice to its standing in a court of equity. See *Trust Co.* v. *Midland Co.*, 117 U. S. 437, 6 Sup. Ct. Rep. 809.

Equity relieves suitors who are diligent, and remits to their legal reme-

dies those who have slept upon their rights, and this is done although the suitor's equitable right may otherwise be apparently perfect.    It is not so in courts of law.    There the suitor may wait until the day before his right of action is barred by the statute of limitations.    The defense of laches goes to the remedy rather than to the right.    In refusing affirmative relief on the ground of negligence, a court of equity does not adjudicate against the right asserted in the bill.    It simply holds that the complainant is not entitled to the particular remedy sought.    "Nothing," said Lord CAMDEN, in *Smith* v. *Clay*, Amb. 645, "can call forth this court into activity but conscience, good faith, and reasonable diligence.    When these are wanting the court is passive, and does nothing.    Laches and neglect are always discountenanced."    Decisions of the supreme court of the United States and other courts need not be cited in support of this doctrine.

By this suit in equity the complainant seeks to recover possession of real estate and quiet its title to the same.    Ejectment is a legal, and not an equitable remedy, and the action will lie to recover the possession of a railroad.    *Railroad* v. *Johnson*, 119 U. S. 608, 7 Sup. Ct. Rep. 339. The bill cannot be sustained as a bill *quia timet*, the complainant being out of possession, and the defendant in possession.    *Frost* v. *Spitley*, 121 U. S. 556, 7 Sup. Ct. Rep. 1129.    The Illinois statute of 1869 (Starr & C. St. 419) authorizes the court to hear bills to quiet title, and to remove clouds from the title to land, whether improved or occupied, or unimproved or unoccupied; and declares that the taking possession of such land after the commencement of suit by the party who claims title adversely shall not affect the complainant's right to relief.    This statute does not authorize suit by a party out of possession against a party already in possession, under a claim of adverse title as in this case.

Finally, is the bill multifarious or contradictory?    We think it is.    It contains two distinct grounds of suit; one for the rescission of the contract, on the theory that it is void, and the other for an accounting and a recovery of earnings, on the theory that it is valid.    The averments that relate to the first ground of relief are wholly irrelevant, if the bill be considered simply as a bill for an accounting.    It is true that a complainant may state the facts of his case, and ask relief according to the conclusion of law which the court may draw from them, although this may be presented in two or more alternatives, (Story Eq. Pl. § 42,) but this is not such a case.    A bill to annul a contract for fraud or illegality, and to specifically enforce it, if the court shall hold that it is valid, is fatally defective; and we can see no substantial difference between such a bill and the one now before us.

*Shields* v. *Barrow*, 17 How. 130, was a suit to set aside an agreement for fraud; and an amendment to the bill was allowed praying specific performance.    In delivering the opinion of the court, Justice CURTIS said:

"So that the bill thereafter presented not only two aspects, but two diametrically opposite prayers for relief, resting upon necessarily inconsistent cases, the one being that the court would declare the contract rescinded for imposition, and other causes, and the other that the court would declare it so free

from all exception as to be entitled to its aid by a decree for specific performance. \* \* \* A bill may be originally framed with a double aspect, or it may be so amended as to be of that character; but the alternative case stated must be the foundation for precisely the same relief."

The demurrer is sustained.